EXHIBIT "A"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ALLAN and GLADYS SCHAFFER,
JOHN and ELAINE DURAND, and
ALBERT J. and MARY BETH
SAULNIER, on behalf of themselves and
all others similarly situated,

                    Plaintiffs,

          vs.

LITTON LOAN SERVICING, LP, and
DOES 1-100, inclusive,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 05-07673 MMM (CTx)

ORDER GRANTING PLAINTIFFS'
MOTION FOR CERTIFICATION OF A
NATIONWIDE RESPA CLASS

Plaintiffs Allan and Gladys Schaffer, John and Elaine Durand, and Albert J. and Mary Beth Saulnier filed this putative class action against defendant Litton Loan Servicing, LP ("Litton") on October 25, 2006. Each named plaintiff is a California homeowner with a mortgage loan serviced by Litton. Plaintiffs allege that Litton engaged in a scheme whereby it failed accurately to service its borrowers' loans and then falsely claimed that the borrowers were in default. They contend that Litton misapplied or failed to credit payments in a timely fashion, charged unwarranted fees, prematurely referred accounts for collection, and procured hazard insurance for properties already insured. The complaint pleads claims for (1) violation of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 et seq.; (2) violation of California Business

& Professions Code §§ 17200 et seq.; (3) breach of contract; (4) unjust enrichment; and (5) declaratory and injunctive relief. Plaintiffs previously moved for certification of two classes: a nationwide RESPA class of all Litton borrowers and a statewide subclass of Litton borrowers whose mortgage loans involve property located in California. On April 23, 2007, the court issued a tentative order denying certification of both classes. It also issued a minute order directing plaintiffs to file a renewed motion for certification of a California class and to submit additional evidence regarding the numerosity of the proposed nationwide RESPA class. In the same minute order, the court granted Litton's request to file a further brief and evidence regarding plaintiffs' motion to certify the nationwide RESPA class under Rule 23(b)(3) of the Federal Rules of Civil Procedure. This order addresses plaintiffs' motion to certify a nationwide RESPA class.[1]

## I. FACTUAL BACKGROUND

### A.    Litton Loan Servicing LP

Litton is a limited partnership in the business of servicing residential mortgage loans. Its headquarters are located in Houston, Texas, and it has a branch office in Atlanta, Georgia. The company employs approximately 1,200 employees, and has been in business since 1988.[2] Its general partner is Litton GP LLC; its limited partner is Litton Holding LLC, a wholly owned subsidiary of Credit Based Asset Servicing and Securitization, LLC ("C-BASS").[3]

As C-BASS's servicing arm, Litton specializes in servicing sub-prime loans that are at higher-than-usual risk of default and foreclosure.[4] It does not originate or refinance loans, nor

---

[1] Plaintiffs' renewed motion for certification of a California class is addressed in a separate order.

[2] Declaration of Stephen Staid, Volume I ("Staid Decl. I"), ¶ 3.

[3] Declaration of Heather H. Wong ("Wong Decl."), Exh. 1 (Fitch Rating 2005 Servicer Report).

[4] Staid Decl. I, ¶ 11. According to a January 2, 2006 report by Moody's Investors Service, Litton's servicing portfolio is comprised of 89.1 percent subprime loans, 5.2 percent second lien loans, 0.1 percent loans with a high loan to value ratio, 0.2 percent FHA/VA loans, and 5.1

2

1  does it hold title to the mortgage loans it services. Rather, the originator or a subsequent investor

2  typically transfers the loans to Litton for servicing pursuant to contract.[5]  Some loans are

3  delinquent or already in foreclosure when they are transferred to Litton.[6]

4    As a loan servicer, Litton handles the operational aspects of the loans.  It sends out

5  monthly statements to borrowers, receives and records payments, pays taxes, obtains insurance

6  if required by the loan documents, maintains an accounting on each loan, imposes late fees and

7  other charges, notifies borrowers when their payments are overdue, collects overdue payments,

8  handles customer inquiries and complaints, engages in loss mitigation, initiates foreclosure

9  proceedings and oversees foreclosures sales, and reports defaulting borrowers to national credit

10  bureaus.

11    The company receives high marks from Moody's Investors Service and FitchRatings for

12  its "above average" collections, its "innovative and proactive" approach to collections,[7] and its

13  "sophisticated default management processes."[8]  Its strength in collections management and loss

14  mitigation stems in part from its technology.[9]  Litton uses a Loan Servicing Accounting

15  Management System ("LSAMS") as its servicing platform and a proprietary Risk Assessment

16  Default Analytic and Reporting ("RADAR") system that monitors performance. There is a two-

17  way feed of information between the systems. According to Stephen Staid, Litton's Senior Vice

18  President of Default Administration, federal and state laws and regulations are coded into the

19

20

21

_____

22  percent non-performing loans. (Wong Decl., Exh. 3 (Moody's Investors Service Report, Jan. 2, 2006 at 2)).

23  [5]Staid Decl. I, ¶¶ 4, 8, 9, 10.

24

25  [6]*Id.*, ¶ 11.

26  [7]Wong Decl., Exh. 3 (Moody's Report, Jan. 2, 2006 at 3).

27  [8]*Id.*, Exh. 1 (FitchRatings Report at 5).

28  [9]Staid Decl. I, ¶ 32; Wong Decl., Exh. 3 (Moody's Report, Jan. 2, 2006 at 3).

servicing systems to ensure compliance.[10]  Investor-specific requirements are likewise coded into the systems.[11]

**B.    Alleged Problems In Litton's Servicing Of Loans**

Plaintiffs allege that Litton's reliance on automated processes and its rapid portfolio growth[12] combined to overwhelm key aspects of its loan processing. They assert that Litton's loan "boarding" process is flawed and sets the stage for erroneous loan records.  During the "boarding" process, data from the transferring lender is input into Litton's servicing platforms. According to former Litton research specialist Debra Murray, "it was . . . common that information regarding loan histories was improperly transferred from the prior lender during the loan boarding process."[13]  Murray asserts that other common problems occurred because loan information from a prior servicer would be transferred before the borrower made a final payment to that servicer.  Litton's RADAR system would flag such loans as behind payment and automatically charge late fees.[14]  Likewise, prior servicers often did not transmit information as to whether a borrower maintained hazard insurance coverage at the time of transfer.  Instead of verifying with the prior lender whether the borrower had provided proof of insurance, Litton regularly force-placed insurance for the borrower.  Murray contends that charges for force-placed premiums were not typically removed until the borrower called, complained, and provided proof

---

[10]Staid Decl. I, ¶¶ 32-34.

[11]*Id.*, ¶ 34.

[12]Litton serviced 70,000 loans in 2000.  By 2006, it was servicing approximately 400,000 loans. (Staid Decl. I, ¶ 21).  A single transaction – Litton's acquisition of PCFS Mortgages in December 2004 – increased Litton's portfolio by 40 percent, and its subprime segment by more than 50 percent.  (Wong Decl., Exh. 1 (FitchRatings Report at 2)).  Litton reports that its staff expanded from 300 individuals to 1,200 employees between 2000 and 2006.  (Staid Decl. I, ¶ 21).

[13]Wong Decl., Exh. 17 (Declaration of Debra Murray ("Murray Decl."), ¶ 28).

[14]Murray Decl., ¶¶ 26-27.

4

1  of insurance to Litton.[15]

2    Murray, who worked in Litton's research department from February 2001 to November

3  2005, states that more than 95 percent of the customer complaints she researched "were caused

4  by Litton's mistakes in servicing the borrowers' loans and were resolved in favor of the

5  borrower."[16]  About 90 percent of the complaints she addressed involved reports that Litton

6  (1) misapplied or failed to apply payments, (2) charged unwarranted late fees and other fees,

7  (3) considered borrowers in default when they were not behind on their payments, and (4) charged

8  for unwarranted force-placed insurance.  Other borrowers complained that delinquencies reported

9  to credit reporting agencies were not legitimate.[17]

10    Based on these facts, plaintiffs' complaint alleges that Litton charged improper late fees,

11  improperly reported borrowers to collection agencies and national credit reporting agencies,

12  improperly forced borrowers to purchase insurance for their property, improperly initiated default

13  and foreclosure proceedings, and refused to answer customer questions or correct customer

14  accounts.[18]  As noted, they plead claims for (1) violation of the Real Estate Settlement Procedures

15  Act ("RESPA"), 12 U.S.C. §§ 2601 et seq.; (2) violation of California Business & Professions

16  Code §§ 17200 et seq.; (3) breach of contract; (4) unjust enrichment; and (5) declaratory and

17  injunctive relief.

18    **C.**  **The Proposed Class Representatives**

19      **1.**  **Allen And Gladys Schaffer**

20    Allen and Gladys Schaffer ("the Schaffers") own a home in Riverside County, California.

21  Their mortgage lender was Household Financial.  Under the terms of their Note, the Schaffers'

22

23

24  _____

25  [15]*Id.*, ¶¶ 32-34.

26  [16]*Id.*, ¶¶ 3, 7.

27  [17]*Id.*, ¶ 6.

28  [18]Complaint, ¶¶ 14-28.

               5

1  mortgage payments were due on the first day of each month. There was a ten-day grace period.[19]

2  In January 2003, their loan was transferred to Litton for servicing.[20]

3      On June 8, 2004, the Schaffers made a payment of $5,495.62 via Federal Express; the

4  courier's records show that Litton received the check on June 9, 2004 at 9:52 a.m. Nonetheless,

5  on June 22, 2004, the Schaffers received a statement from Litton dated June 14, 2004, indicating

6  that Litton had credited $549.62 to their account, and that there was an outstanding balance of

7  $10,130.54 on the prior month's payment.[21] Gladys Schaffer contacted Litton shortly afterward

8  and learned that the account had been sent to the company's Foreclosure Department.[22]

9      Gladys Schaffer subsequently contacted a representative in Litton's Foreclosure

10  Department, who told her to make no further payments and agreed to investigate the misapplied

11  payments. Feeling uncomfortable about skipping payments, Schaffer tried to make a further

12  payment through Litton's Customer Service Department. Litton refused the payment.[23]

13      On July 13, 2004, Litton sent the Schaffers a "notice of default with intent to accelerate,"

14  stating that a payment of $8,087.89 was required to bring the account current. Litton later gave

15  the Schaffers an August 13, 2004 statement showing that the balance of their June 2004 check for

16  $5,495.62 had been placed in a "forbearance suspense account." It also demanded payment of

17  $10,935.70 to bring the account current.[24]

18      On September 13, 2004, Litton's Customer Service Department instructed Gladys Schaffer

19  to pay $5,184.54 by September 22, 2004. The Schaffers tendered the amount via Federal

20  Express. Nonetheless, on September 23, 2004, they received another "notice of default,"

21

---

22  [19]Declaration of Gladys Schaffer ("Schaffer Decl."), ¶¶ 3-4.

23
24  [20]Id., ¶ 5.

25  [21]Id., ¶¶ 6-7.

26  [22]Id., ¶ 8.

27  [23]Id., ¶¶ 9-10.

28  [24]Id., ¶¶ 11-13.

1  asserting that they were $23,308.83 in arrears. Three days later, Litton advised the Schaffers that

2  it would not accept their $5,184.54 check and that they would have to restructure their loan to

3  avoid foreclosure.[25]

4      Although Litton mailed the Schaffers an application for restructure in early October, a

5  Litton representative later told Gladys Schaffer that restructuring was not an option. In response

6  to further demands for payment of increasing amounts, the Schaffers sent a check for $20,959.10

7  to Litton on October 20, 2004. Eight days later, on October 28, 2004, Litton finally applied

8  payments of $26,143.64 to the Schaffers' account.[26]

9      As a result of these events, Litton charged the Schaffers $2,144.70 in "erroneous late fees"

10  and other fees associated with foreclosure proceedings.[27] Gladys Schaffer also reports that Litton

11  repeatedly threatened to force-place insurance with a premium of $2,995.60, although the

12  Schaffers maintained continuous hazard insurance on their property as required by the loan

13  agreement.[28] In addition, the Schaffers assert that Litton reported their purported default to

14  national credit reporting agencies, and that it has refused to correct the allegedly erroneous

15  reports.[29]

16      **2.    John And Elaine Durand**

17      John and Elaine Durand ("the Durands") took out a mortgage loan on their Santa Clara

18  County, California home from Ocwen Financial Corporation. Under the terms of their Note,

19  mortgage payments were due on the first of each month, subject to a 15-day grace period.[30]

20      The Durands' loan was transferred to Litton for servicing in May 2002, but they did not

21

22      [25]*Id.*, ¶¶ 14-16.

23      [26]*Id.*, ¶¶ 18-21.

24      [27]*Id.*, ¶ 22.

25      [28]*Id.*, ¶¶ 23-24.

26      [29]*Id.*, ¶¶ 25-27.

27      [30]Declaration of Elaine Durand ("Durand Decl."), ¶¶ 3-4.

28

1  learn of the change until June 2002. As a result, they made their May 2002 mortgage payment

2  to Ocwen, which processed the check and applied the payment to their account on May 8, 2002.[31]

3  Despite the payment, Litton sent notices of default based on the Durands' alleged failure to make

4  the May 2002 payment. Litton purportedly told the couple that they had to obtain a refund of the

5  payment from Ocwen.[32]

6      A Litton representative later informed the Durands that the May 2002 payment had been

7  transferred from Ocwen to Litton, and that they would not incur late fees as a result of the error.[33]

8  Despite this assurance, the Durands learned in February 2004 that Litton had been charging late

9  fees to their account since June 2002. A Litton representative advised them that the late fees had

10 been imposed because their May and June 2002 payments were late. The Durands dispute this,

11 noting that their June 2002 check cleared on June 12, 2002, three days before the 15-day grace

12 period expired on June 15, 2002.[34]

13      The Durands allege that Litton also misapplied their payments by, *inter alia*, placing them

14 in a "forbearance suspense account."[35] Like the Schaffers, they report that Litton repeatedly

15 threatened to force-place insurance despite the fact that they maintained continuous hazard

16 insurance on the property in compliance with their loan agreement.[36]

17      Finally, the Durands allege that Litton representatives subjected them to "harassing phone

18 calls" and threatened them with property foreclosure. One Litton representative allegedly called

19 Elaine Durand a "deadbeat," and suggested that she and her husband "make a better effort to pay

20 [their] mortgage on time." Despite numerous contacts by telephone and letter, Litton refused to

21

22 _____

23  [31]*Id.*, ¶¶ 5-7.

24  [32]*Id.*, ¶¶ 8-10.

25  [33]*Id.*, ¶ 10.

26  [34]*Id.*, ¶¶ 11-12.

27  [35]*Id.*, ¶ 15.

28  [36]*Id.*, ¶ 16.

address and correct its errors in servicing the account.[37] The Durands paid off their mortgage loan on April 28, 2004.[38]

### 3. Albert J. And Mary Beth Saulnier

Albert J. and Mary Beth Saulnier ("the Saulniers") own property in San Diego County, California. Their mortgage loan, which was made by Fremont Investment and Loan, was transferred to Litton on October 2, 2003. Under the terms of their Note, the Saulniers' mortgage payment was due on the first of each month; there was a 17-day grace period.[39]

The Saulniers assert they made timely October and November 2003 payments. In a letter dated November 5, 2003 – 12 days before the end of their 17-day grace period – Litton advised that they were past due on their payments for those months.[40] After the Saulniers made a timely December 2003 payment, Litton advised them, by letter dated December 18, 2003, that their December 2003 payment was past due, and that a late fee would be assessed.[41] The Saulniers assert that they have repeatedly been charged erroneous late fees and other charges. Each time, they reported the errors to Litton and asked it to correct the account. Litton purportedly refused.

Like the Schaffers and the Durands, the Saulniers maintained continuous hazard insurance on their property, as required by their loan agreement. Nonetheless, on May 13 and June 17, 2004, Litton notified them that they did not have proof of insurance and threatened to charge them a premium of $4,294.11 for force-placed insurance. On June 22, 2004, the Saulniers supplied proof of insurance to Litton. Litton nonetheless charged their account $423.23 for force-placed premiums.[42]

---

[37]Id., ¶¶ 18-20.

[38]Declaration of Stephen Staid, Volume II ("Staid Decl. II"), ¶ 93.

[39]Declaration of Mary Beth Saulnier ("Saulnier Decl."), ¶¶ 3-5.

[40]Id., ¶ 6.

[41]Id. ,¶ 7.

[42]Id., ¶¶ 11-13.

On April 13, 2005, Litton acknowledged that it had received proof of continuous insurance coverage and agreed to refund the $423.23 premium. To the Saulniers' knowledge, however, Litton never refunded the money or credited their account.[43]

The Saulniers assert that they made timely payments in October, November, and December 2003. Yet, on January 16, 2004, Litton sent them a "notice of default with intent to accelerate" and threatened to foreclose on their home. Litton sent further notices of default in February, March, April, May, and June 2004.[44] The Saulniers allege that Litton has refused to address servicing errors despite repeated requests by telephone and e-mail.[45]

Finally, the Saulniers contend that Litton falsely reported to national credit reporting agencies that their mortgage was in default. Although they asked Litton to correct the reports, Litton allegedly refused.[46]

D.    The Proposed Classes

In their moving papers, plaintiffs sought certification of a nationwide class ("Nationwide Class") defined as follows:

"All persons (i) who presently own, or during the Class Period owned, property (including mobile homes) in the United States, and (ii) who entered into a mortgage loan transaction which was then transferred or sold to Litton or for which the servicing rights were acquired by Litton Loan Servicing, LP or its predecessors, directly or indirectly, at any time between October 26, 2002, and the present."[47]

---

[43]Id., ¶ 14.

[44]Id., ¶ 15.

[45]Id., ¶ 16.

[46]Id., ¶¶ 18-20.

[47]Complaint, ¶ 30.

10

## II. DISCUSSION

### A.    Legal Standard Governing Class Certification

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect the rights of persons who might not be able to present claims on an individual basis." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 647 (C.D. Cal. 1996) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983)). Under Rule 23 of the Federal Rules of Civil Procedure, a class "may be certified [only] if the trial court is satisfied after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. of the Southwest v. Falcon*, 457 U.S., 147, 161 (1982). The burden is on plaintiffs, as the parties seeking certification, to make a prima facie showing that each of the prerequisites set forth in Rule 23(a) has been satisfied, i.e., (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. See, e.g., *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Although not specifically mentioned in Rule 23(a), there is an additional prerequisite to certification – that the class be ascertainable.[48] See, e.g., *Lukovsky v. San Francisco*, No. C 05-00389 WHA, 2006 WL 140574, *2 (N.D. Cal. Jan. 17, 2006) ("'Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed,'" quoting *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999)); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 163 (C.D. Cal. 2002) ("Prior to class certification, plaintiffs must first define an ascertainable and identifiable class. Once an ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)" (citation and footnote omitted)); *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D.

---

[48]This is an explicit requirement for maintenance of a class action under California law. See, e.g., *Lockheed Martin Corp. v. Superior Court*, 29 Cal.4th 1096, 1104 (2003). To establish that a proposed class is ascertainable, the factors that must be considered are (1) the class definition, (2) the class size, and (3) available means for identifying class members. *Global Minerals & Metals Corp. v. Superior Court*, 113 Cal.App.4th 836, 858 (2003).

11

1   Cal. 1998) (holding that a class definition must be "precise, objective and presently
2   ascertainable"); *Bishop v. Saab Auto. A.B.*, No. CV 95-0721 JGD (JRx), 1996 WL 33150020,
3   *4 (C.D. Cal. Feb. 16, 1996) ("To file an action on behalf of a class, the named plaintiffs must
4   be members of the class that they purport to represent at the time the class action is certified. The
5   named plaintiffs must also demonstrate that the class is ascertainable" (citation omitted)); see also,
6   e.g., *In re A.H. Robbins Co., Inc.*, 880 F.2d 709, 728 (4th Cir. 1989) (same), abrogated on other
7   grounds by *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997); *Bentley v. Honeywell*
8   *Intern., Inc.*, 223 F.R.D. 471, 477 (S.D. Ohio 2004) ("Before delving into the 'rigorous analysis'
9   required by Rule 23, a court first should consider whether a precisely defined class exists and
10  whether the named plaintiffs are members of the proposed class"); *Robinson v. Gillespie*, 219
11  F.R.D. 179, 183 (D. Kan. 2003) ("In determining whether to certify a class, the court begins
12  with the proposed definition of the class" because "[a]bsent a cognizable class, determining
13  whether Plaintiffs . . . satisfy the other Rule 23(a) and (b) requirements is unnecessary" (internal
14  quotations omitted)); *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 346 (S.D. Ga. 1996)
15  ("Before considering the requirements of Rule 23 . . . a court must determine whether a class
16  exists that can adequately be defined. . . . [C]lass definition is an implicit requirement which
17  must be met before a Rule 23 analysis can be undertaken by the district court").

18      A class is sufficiently defined if it is "administratively feasible for the court to determine
19  whether a particular individual is a member." *O'Connor*, 184 F.R.D. at 319; accord *Davoll v.*
20  *Webb*, 160 F.R.D. 142, 143 (D. Colo. 1995); see also *Buford*, 168 F.R.D. at 347 ("[T]he
21  'description of the class must be sufficiently definite to enable the court to determine if a
22  particular individual is a member of the proposed class,'" quoting *Pottinger v. Miami*, 720
23  F.Supp. 955, 957 (S.D. Fla. 1989)). "Where . . . a decision on the merits of a person's claim
24  is needed to determine whether a person is a member of a class, the proposed class action is
25  unmanageable virtually by definition." *Kenro, Inc. v. Fax Daily, Inc.*, 962 F.Supp. 1162, 1169
26  (S.D. Ind. 1997); see also *Armstrong v. Chicago Park Dist.*, 117 F.R.D. 623, 626-27 (N.D. Ill.
27  1987) (a class definition is "self defeating" if "the court is forced to consider the merits of the
28  controversy and to deny [certification] because of an inability to define who belongs in [the class]

1  before there has been a full trial"). The need for a definition that permits identification of
2  members of the class is particularly important where plaintiff seeks certification under Rule
3  23(b)(3) because of the notice requirements that must be satisfied for such a class. See *O'Connor*,
4  184 F.R.D. at 319 ("[D]ue to notice requirements, class definitions of actions maintained under
5  Rule 23(b)(3) command greater precision than those brought under Rule 23(b)(1) or (b)(2)").

6       Once the court determines that a class is sufficiently ascertainable, it must examine whether
7  the class meets the numerosity, commonality, typicality and adequacy requirements of Rule 23(a).
8  If these prerequisites are met, the court must consider whether the class is maintainable under
9  Rule 23(b). See, e.g., *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)
10 ("In order for a class action to be certified, the plaintiffs must establish the four prerequisites of
11 Fed.R.Civ. P. 23(a) and at least one of the alternative requirements of Fed.R.Civ.P. 23(b)").

12      Plaintiffs here seek certification under Rule 23(b)(2) and Rule 23(b)(3). Rule 23(b)(2)
13 authorizes certification where Rule 23(a) is satisfied and the "party opposing the class has acted
14 or refused to act on grounds generally applicable to the class, thereby making appropriate final
15 injunctive relief or corresponding declaratory relief with respect to the class as a whole."
16 FED.R.CIV.PROC. 23(b)(2). A class seeking monetary damages may be certified under Rule
17 23(b)(2) only where such relief is 'merely incidental to [the] primary claim for injunctive relief.'"
18 *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001), as amended, 273
19 F.3d 1266 (9th Cir. 2001) (quoting *Probe v. State Teachers' Retirement System*, 780 F.2d 776,
20 780 (9th Cir. 1986)).

21      A class is maintainable under Rule 23(b)(3) where both (i) "questions of law or fact
22 common to the members of the class predominate over any questions affecting only individual
23 members," and (ii) where "a class action is superior to other available methods for fair and
24 efficient adjudication of the controversy." FED.R.CIV.PROC. 23(b)(3). "The Rule 23(b)(3)
25 predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant
26 adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)
27 (citing *Amchem Products*, 521 U.S. at 614-15). The test presumes that the commonality
28 requirement of Rule 23(a) has been met, and examines the "relationship between the common and

13

1   individual issues." *Id.* In determining superiority, the court must consider the four factors set

2   forth in Rule 23(b)(3): (1) the interests class members have in individually controlling the

3   prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning

4   the controversy that has already been commenced by or against class members; (3) the desirability

5   or undesirability of concentrating litigation of the claims in the particular forum; and (4) the

6   difficulties that will likely be encountered in managing the suit as a class action. *Id.* at 1190-93.

7           In deciding whether to certify a class under Rule 23, an inquiry regarding "the merits of

8   the claims is [generally] inappropriate." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay

9   Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1759 (2006); *see also Eisen v. Carlisle*

10  *& Jacquelin*, 417 U.S. 156, 177-78 (1974); *Valentino*, 97 F.3d at 1232. Nonetheless, the court

11  may find it necessary to look beyond the pleadings and examine plaintiffs' substantive claims to

12  determine whether the elements of Rule 23 have been met. *See, e.g., Falcon*, 457 U.S. at 160;

13  *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (determining whether to certify a class

14  "generally involves considerations that are enmeshed in the factual and legal issues comprising

15  the plaintiff's cause of action" (internal quotations omitted)); *Hanon*, 976 F.2d at 509 (holding

16  that the court may consider evidence regarding the merits of the claims to determine whether Rule

17  23 has been satisfied); *In re Unioil Secs. Litig.*, 107 F.R.D. 615, 618 (C.D. Cal. 1985)

18  ("[N]otwithstanding its obligation to take the allegations in the complaint as true, the Court is at

19  liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence

20  may also relate to the underlying merits of the case").

21          As the Fourth Circuit has recently observed, "[i]f it were appropriate for a court simply

22  to accept the allegations of a complaint at face value in making class action findings, every

23  complaint asserting the requirements of Rule 23(a) and (b) would automatically lead to a

24  certification order, frustrating the district court's responsibilities for taking a 'close look' at

25  relevant matters, for conducting a 'rigorous analysis' of such matters, and for making 'findings'

26  that the requirements of Rule 23 have been satisfied." *Gariety v. Grant Thornton, LLP*, 368 F.3d

27  356, 365 (4th Cir. 2004).

28

14

## B.    Plaintiffs' Theory Of Liability

Plaintiffs contend that Litton's liability can be "determined by looking at Litton's failure to properly staff, supervise, and control quality in its servicing of mortgage loans."[49] They assert that failures of these types have resulted in "uniform, unlawful actions" that form the basis of their claims, and identify alleged actions such as misapplying payments, charging unwarranted late fees, prematurely referring accounts for collection, prematurely threatening or attempting foreclosure, and attempting to impose force-placed insurance on already-insured homes without cause.[50] Plaintiffs seek to prove Litton's liability by adducing evidence of understaffing, lack of supervision, and poor quality control, which they contend caused widespread servicing errors about which Litton knew, but which it did not address. In support, plaintiffs rely heavily on the declarations of Valerie Mathews and Debra Murray.[51] Mathews worked at Litton as a cash

---

[49]Mot. at 18:18-20.

[50]*Id.* at 18:20-25.

[51]Litton has submitted the declarations of Litton supervisors and executives who attack the credibility of Murray and Matthews. (See, e.g., Declaration of Yvette Dillard in Opposition to Plaintiffs' Motion for Class Certification; Declaration of Robert Tompkins in Opposition to Plaintiffs' Motion for Class Certification). Because, as noted, the court does not resolve credibility questions at the class certification stage, it declines to consider Litton's evidence to the extent it attacks Murray's and Matthews' credibility. See *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214, 1227 (9th Cir. 2007) ("*Dukes II*") (stating that the district court does not consider the weight of merits evidence at the class certification stage).

In a series of documents filed just days before the hearing on plaintiffs' first motion for class certification, Litton offered further objections to Murray's and Mathews' declarations. It contends that neither declarant was identified in response to Litton's interrogatories, that Litton did not have an opportunity to depose the declarants, and that their affidavits should be stricken as a result. Rule 26(e) of the Federal Rules of Civil Procedure provides that litigants are "under a duty seasonably to amend a prior response to an interrogatory . . . if the party learns that the response is in some material respect incomplete or incorrect." This requirement is given "teeth" by Rule 37, which provides that "[a] party that without substantial justification fails to disclose information required by . . . Rule 26(e)(2) . . . shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." FED. R. CIV. PROC. 37(c)(1). Rule 37's exclusionary sanctions are "self-executing" and "automatic" unless the proffering party shows that its failure to disclose was substantially justified or harmless. See, e.g., *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101,

15

1    processor between January 2001 and June 2005.[52] Murray was a research specialist with Litton

2    between February 2001 and November 2005.[53]

3           1.    **Quality Control**

4           As a cash processor, Mathews entered payments into Litton's computer system. For

5    _____

6    1106 (9th Cir. 2001); *Cambridge Electronics Corp. v. MGA Electronics, Inc.*, 227 F.R.D. 313,

7    323 (C.D. Cal. 2004). The burden of establishing substantial justification or harmlessness rests
     with the party that failed to make the required disclosure. *Yeti by Molly*, 259 F.3d at 1107.

8           Having reviewed plaintiffs' response to Litton's objections, the court concludes that Rule
     37 exclusionary sanctions are inappropriate here. Murray's identity was disclosed to Litton on

9    November 2, 2006, in connection with plaintiffs' opposition to Litton's motion for a protective
     order in a related case pending before Judge Kramer in San Francisco Superior Court, *All v.*

10   *Litton Loan Servicing*, Case No. 04-435880. (Declaration of Elizabeth A. Alexander in Support
     of Plaintiffs' Response to Litton's Rule 26 and Rule 37 Positions ("Alexander Decl."), ¶¶ 8-9,

11   13). Although Litton received a copy of a declaration by Murray more than three months before

12   plaintiffs filed their motion for class certification in this case, and more than four months before
     Litton filed its opposition to the motion, it elected not to depose Murray. (*Id.*, ¶ 13). Under the

13   circumstances, Litton can hardly complain that it was harmed by plaintiffs' failure to identify

14   Murray in response to interrogatories. Compare *Lemon v. Harlem Globetrotters Intern., Inc.*,
     Nos. CV 04-0299 PHX DGC, CV 04-1023 PHX DGC, 2006 WL 3524379, *8 (D. Ariz. Dec.

15   6, 2006) ("the late disclosure of a witness or exhibit will not be deemed harmless if the Court

16   concludes that Defendants would have deposed the witness . . . during the discovery period had
     the witness. . . been timely disclosed").

17           Plaintiffs represent that they did not learn of Mathews' identity until February 2, 2007.

18   (Alexander Decl., ¶ 2). On February 3 or 6, 2007, their attorney, Beth Alexander, spoke with
     Mathews. Alexander prepared a first draft of Mathews' declaration on February 7, 2007, and

19   received her signed declaration on February 15, 2007 - one day before plaintiffs filed the

20   declaration in support of their motion for class certification in the *All* case and four days before
     they filed it in support of their motion in this case. (*Id.*, ¶¶ 2-5). Although the court does not

21   condone plaintiffs' decision to delay disclosure of Mathews' identity for two weeks, it nonetheless
     finds the relatively short delay to be substantially justified. See *Space Systems/Loral, Inc. v.*

22   *Lockheed Martin Corp.*, No. C 96-03418 ST, 2006 WL 279331, *6 n. 7 (N.D. Cal. Feb. 6,

23   2006) (finding substantial justification for the non-disclosure of witness because the party had
     learned of the witness' existence "only recently"). The delay was apparently harmless in any

24   case, as defendant received Mathews' declaration a month before it filed its opposition to

25   plaintiffs' certification motion, but made no effort to depose her during that time.

26           [52]Declaration of Valerie Mathews in Support of Plaintiffs' Reply Brief ("Mathews Decl.
     II"), ¶¶ 2-3.

27           [53]Declaration of Debra Murray in Support of Plaintiffs' Reply Brief ("Murray Decl. I"),

28   ¶¶ 2-3.

1   approximately six months, she also performed quality control duties for the cash management

2   department and corrected misapplied payments.  Mathews asserts that quality control duties were

3   considered an undesirable assignment because it meant more work without more pay; as a result,

4   quality control duties were passed from one cash processor to the next with frequency.[54]  While

5   performing quality control, Mathews observed that the automated computer system that read and

6   applied borrowers' payments regularly misapplied payment amounts that differed from the

7   borrower's regular payment amount.[55]

8       Mathews asserts that cash processors were pressured to process payments quickly, often

9   at the expense of accuracy.  One of her managers reportedly told her that she could lose her job

10  if she did not enter enough payments each day.  Other employees told her that management ran

11  a periodic report showing the number of payments each cash processor had applied.  She states

12  that her supervisor reprimanded or terminated several employees because they did not process

13  enough payments every day.[56]

14      Mathews acknowledges that Litton had written policies regarding payment posting, but

15  asserts that cash processors frequently ignored these policies.  One policy required that all

16  payments be processed and applied on the day Litton received the payment.  About twice a week,

17  however, payments were applied the following day simply because cash processors were

18  overwhelmed by the volume of payments to be processed.[57]

19      Murray, a research specialist responsible for investigating and resolving customer

20  complaints, confirms that errors by the cash management department comprised a large percentage

21  of the customer complaints received by Litton.  She estimates that about 90 percent of the

22

23  _____

24  [54]Wong Decl., Exh. 16 (Declaration of Valerie Mathews ("Mathews Decl. I"), ¶¶ 4-7).

25  [55]Id., ¶ 8.

26  [56]Id., ¶¶ 17-18.

27  [57]Id., ¶ 22.  Litton contends that 96 percent of payments are processed on the date of
28  receipt.  The remaining percentage are applied within approximately 1.7 days.  (Declaration of
    Joseph Laigaie ("Laigaie Decl."), ¶ 44).

17

complaints she researched involved reports that Litton (1) failed to apply or misapplied payments, (2) charged unwarranted late fees, (3) placed borrowers in default when they were not behind on their payments, and (4) charged unwarranted force-placed insurance.[58] She asserts that, of the complaints she researched, more than 95 percent were caused by servicing mistakes and resolved in the customer's favor.[59]

On occasion, when Murray spent time in the cash management department for research purposes, she observed payments lying on the floor and a great deal of disorganization, which she attributed to the department's lack of employees.[60] She also noted that the cash management department "seemed to be less concerned with accuracy in applying the payments than in processing them as quickly as possible because they could not keep up with the large volume of payments."[61] She asserts that, when a payment could not be matched up with an account, cash processors would simply place the payment in a "payment clearing account." Murray contends that payments would sometimes sit in the payment clearing account "for years" without being applied to a borrower's account. In the meantime, the borrower would be assessed late fees and be deemed to be in default.[62]

Even when Murray found a missing payment, she was directed to apply the payment as of the date it was located, not the date it was received by Litton. As a result, late fees were often imposed simply because Litton did not apply the payment in a timely fashion.[63] This occurred in part because late fees are assessed automatically, and late fee notification letters are generated

---

[58]Murray Decl. I, ¶ 6.

[59]Id. , ¶ 7.

[60]Murray Decl. I, ¶ 18.

[61]Id., ¶ 19.

[62]Id., ¶¶ 20-21.

[63]Id., ¶¶ 21-22.

1  automatically by Litton's automated data system without manual control or review.[64] Likewise,

2  loans are automatically referred to Litton's foreclosure department within seven days after a

3  "notice of default with intent to accelerate" expires without payment.[65] Plaintiffs have submitted

4  declarations from ten borrowers, all of whom state that Litton considered their loans in default

5  even though they gave Litton payment history information, including endorsed checks, that proved

6  they were current on their payments.[66]

7

8  [64]Wong Decl., Exh. 13 (Deposition of Stephen Staid ("Staid Depo.") at 31:4-6, 65:6-21.

9  [65]Id. at 13:8-14:10.

10  [66]See Declaration of Michael Young ("Young Decl."), ¶¶ 11-12; Declaration of Shari

11  Stratton ("Stratton Decl."), ¶¶ 8-9; Declaration of Orissa Kruse ("Kruse Decl."), ¶¶ 13-14;

12  Declaration of Mark Cleveland ("Cleveland Decl."), ¶¶ 16-17; Declaration of Robynn Harrington

    ("Harrington Decl."), ¶¶ 7-8; Declaration of Mary Brandenburg ("Brandenburg Decl."), ¶¶ 12-

13  14; Declaration of Pamela Alonso ("Alonso Decl."), ¶¶ 13-14; Declaration of Jeffrey Maniff

14  ("Maniff Decl."), ¶¶ 19-120; Declaration of Rene Budd ("Budd Decl."), ¶¶ 8-9; Declaration of

    Sherry Perry ("Perry Decl."), ¶¶ 8-9. In objections filed April 18, 2007, Litton argues that 22

15  of plaintiffs' class-member declarants were not identified in discovery and should be excluded.

    These declarants are: Pamela Alonso, Louise Appelhans, Sidney Atkinson, Christopher R. Berry,

16  Melissa Boyd, Mary Brandenburg, Tommy Ryan Brock, LaAntinique Q. Brown, Mark

17  Cleveland, Melissa L. Clevenger-Stoner, Regina Cole, Virginia De Matteo, Michael Dilworth,

    Patty J. Felt, Robynn Harrington, Orissa Kruse, Krsitine Laurie, Samuel A. Maccarelli, Jeffrey

18  Maniff, Sherry Perry, Shari Lynn Stratton, and Michael A. Young.

19       Plaintiffs represent that twelve of these declarants signed their declarations between

    January 23 and February 16, 2007, i.e., less than four weeks before plaintiffs filed the

20  declarations in support of their motion on February 20, 2007. (Alexander Decl., ¶ 18). The

21  other ten declarations were signed between September 22 and December 15, 2006. (Id.).

    Plaintiffs do not indicate when any of the declarants was first identified as a potential witness.

22  They argue that any delayed disclosure was harmless, however. The court agrees. Plaintiffs

23  represent that defendants made no effort to depose, or otherwise obtain discovery regarding,

    twelve other declarants (including 8 consumer declarants who submitted affidavits in support of

24  plaintiffs' motion for class certification in this case) despite the fact that they were disclosed in

    connection with discovery motions in the All case on October 5 and November 2, 2006. (Id.,

25  ¶¶ 14-17). It is apparent from defendant's failure to depose any of the consumer declarants that

26  defendant intended to respond to the declarations by analyzing information in its own records for

    each consumer. (See, e.g., Order Striking Supplemental Declaration of Stephen Staid Addressing

27  Individual Litton Customer Declarations (Docket No. 108); [Proposed] Supplemental Declaration

    of Stephen Staid: Volume II Addressing Individual Litton Customer Declarations (lodged)). As

28  a result, the delayed disclosure of some of the declarants' names did not prejudice defendant's

19

1    Plaintiffs also assert that Litton's "boarding" process is flawed and gives rise to erroneous

2 loan records. During this process, data from the transferring lender is input into Litton's

3 servicing platforms. Thomas Hruska, the manager of Litton's loan transfer department, reports

4 that approximately 10 percent of the transferred loans are checked to ensure that the data input

5 to the system accurately reflects the loan papers.[67] Murray observes, however, that "it was . . .

6 common that information regarding loan histories was improperly transferred from the prior

7 lender during the loan boarding process."[68]

8    Murray states that loan information from a prior servicer was often transferred before the

9 borrower made a final payment to the prior servicer. As a result, Litton's RADAR system

10 flagged the loans as behind payment and automatically charged late fees.[69] Likewise, prior

11

12 _____

ability to respond to the facts stated in the declarations. Defendant's request for Rule 37

13 exclusionary sanctions is therefore denied.

Litton also asserts that seven of the declarants – Michael E. Young, Orissa Kruse, Pamela

14 K. Alonso, Mary Brandenburg, Melissa L. Clevenger-Stoner, Christopher R. Berry, and Virginia

De Matteo – do not appear to be obligors on a mortgage loan serviced by Litton. (Declaration

15 of R. Bruce Allensworth in Support of Litton Loan Servicing LP's Objections to the Declarations

of Debra Murray, Valerie Mathews, and Certain Customer Declarations, ¶¶ 3-4). Litton

16 represents that it requested the property address and Litton loan numbers for these declarants from

17 plaintiffs' counsel, who were able to locate and produce such information for only one of the

seven, Melissa L. Clevenger-Stoner. (Id., ¶ 4 and Exh. A). Because each declarant asserts under

18 penalty of perjury that he or she had or has a loan serviced by Litton, the court will consider their

19 declarations.

20    [67] Wong Decl., Exh. 15 (Deposition of Thomas Hruska ("Hruska Depo.") at 31:13-32:14)).

21    [68] Murray Decl. I, ¶ 28.

22    [69] Murray Decl. I, ¶¶ 26-27. Plaintiffs also offer fifteen declarations from borrowers who

23 state that Litton charged late fees on payments that had been timely made to prior servicers. See

Durand Decl., ¶¶ 7-10 (noting that she made a payment to her prior lender in May 2002 that was

24 not applied by Litton until June 2004, and that she was charged late fees as a result; Declaration

25 of Orissa Kruse ("Kruse Decl."), ¶¶ 8-9 (stating that she made a mortgage payment to her prior

lender in December 2004, but that it was not credited by Litton, which immediately assessed late

26 fees against her); see also Declaration of Pam Alonso ("Alonso Decl."), ¶¶ 7-8; Declaration of

27 Suzanne Anderson ("Anderson Decl."), ¶¶ 8-11; Declaration of Russell Barnaby ("Barnaby

Decl."), ¶¶ 7-8; Declaration of Renee and Brian Budd ("Budd Decl."), ¶¶ 7-8; Declaration of

28 Virginia De Matteo ("De Matteo Decl."), ¶¶ 7-8; Declaration of Michael Dillsworth ("Dillsworth

1   servicers often did not transmit information as to whether a borrower maintained hazard insurance
2   at the time of transfer. Instead of verifying whether the borrower had provided proof of insurance
3   to the prior lender, Litton regularly force-placed insurance. Murray asserts that charges for force-
4   placed premiums were not typically removed until the borrower called, complained, and provided
5   proof of insurance to Litton.[70]

6       Murray asserts that she twice recommended to her supervisor, in 2001 and again in 2003,
7   that Litton review each file when received from the prior servicer to ensure that Litton's loan
8   information was correct.[71] Her supervisor reportedly told her that Litton would not conduct the
9   reviews because they were too expensive.[72]

10  _____

11  Decl."), ¶¶ 7-8; Declaration of Patty J. Felt ("Felt Decl."), ¶¶ 6-12; Declaration of Samuel A.
    Maccarelli ("Maccarelli Decl."), ¶¶ 4-9; Declaration of Jeffrey Maniff ("Maniff Decl."), ¶¶ 7-8;
12  Declaration of Vincent Miles ("Miles Decl."), ¶¶ 7-8; Declaration of Sherry Perry ("Perry
    Decl."), ¶¶ 6-8; Declaration of Melissa L. Clevenger-Stoner ("Clevenger-Stoner Decl."), ¶¶ 5-9;
13  Declaration of Amy Stromberg ("Stromberg Decl."), ¶¶ 7-8.

14
15      [70]Id., ¶¶ 32-34. Plaintiffs proffer six declarations of borrowers who represent that Litton
    charged premiums for force-placed insurance to their accounts despite the fact that they had
16  provided proof of insurance to their prior servicer or to Litton. See Declaration of Sandi French
    ("French Decl."), ¶¶ 8-10 (stating that Litton charged her for force-placed insurance even though
17  she provided proof of insurance to the prior servicer); Declaration of Nicole Sanders ("Sanders
    Decl."), ¶¶ 5, 13-16; Saulnier Decl., ¶¶ 11-14; Declaration of Michael Young ("Young Decl."),
18  ¶¶ 13-16; Kruse Decl., ¶¶ 15-19; Declaration of Kristine Laurie ("Laurie Decl."), ¶¶ 11-14.

19
20      [71]Id., ¶ 31.

21      [72]Id.. Plaintiffs support this anecdotal evidence with copies of "Presidential Complaints."
    These complaints include those sent directly to Litton's president, those escalated through the
22  business departments to the executive resolution team, those referred to Litton by the Better
    Business Bureau, letters from attorneys, and inquiries from borrowers forwarded to Litton by
23  outside agencies. (Staid Decl. I, ¶ 114.) Plaintiffs' counsel, Heather Wong, asserts that, based
    on plaintiffs' review of 162 Presidential Complaints, 42 reflect "boarding" problems, 25 concern
24  misapplied payments, 91 allege that Litton charged unwarranted late fees, 33 pertain to
    unwarranted force-placed insurance, 16 charge that Litton initiated foreclosure proceedings
25  without cause, and 19 concern false reporting of delinquencies to credit agencies. (See Wong
    Decl., ¶ 2.) The complaints were reviewed and summarized in a spreadsheet document by
26  Thomas A. Jenkins of Jenkins, Mulligan & Gabriel LLP. (Id.) In addition, plaintiffs submit "a
27  spreadsheet summarizing consumer complaints lodged against Litton Loan Servicing, LP received
28  from the Federal Trade Commission pursuant to Plaintiffs' counsel's FOIA requests." (Id., ¶ 34

                                21

## 2.    Staffing And Supervision

Both Mathews and Murray state that Litton was severely understaffed during their tenure with the company. Mathews reports that the cash management department employed 8-10 individuals in 2001, and 15-20 individuals in 2005.[73] Between 2000 and 2006, however, Litton's loan portfolio increased more than five-fold, from 70,000 to 400,000 loans.[74] To keep up with

---

and Exh. 32). Litton objects to this evidence on the grounds that (1) neither Wong nor Jenkins is a fact or expert witness in this case; (2) Wong lacks personal knowledge of the information to which she is testifying; and (3) the spreadsheet lacks foundation and was not provided to Litton in discovery.

The court agrees that Wong does not have personal knowledge of the information gleaned by Jenkins during his review of the Presidential Complaints. Wong does not assert that she prepared the spreadsheet or that she reviewed the Presidential Complaints; she asserts only that Jenkins reviewed the complaints and that he prepared the summary attached to her declaration. (Id., ¶ 2). The court will therefore disregard the description of the complaints set forth in Wong's declaration. The foundational objection to the spreadsheet is also sustained. The spreadsheet summarizes complaints against Litton that were produced by the Federal Trade Commission ("FTC") pursuant to plaintiffs' FOIA request. Wong does not explain who prepared the spreadsheet or how it was prepared; nor does she attach the actual complaints produced by the FTC. Litton does not assert that the underlying records are inadmissible, however. Assuming Litton has access to those records, the spreadsheet would be admissible under Rule 1006 of the Federal Rules of Evidence if a proper foundation were laid. See *Amarel v. Connell*, 102 F.3d 1494, 1517 (9th Cir. 1996) (stating that "[a] proponent of a summary exhibit must establish a foundation that (1) the underlying materials on which the summary exhibit is based are admissible in evidence, and (2) those underlying materials were made available to the opposing party for inspection"). Wong, however, cannot lay a proper foundation, as there is no indication that she participated in the preparation of the spreadsheet, or that she oversaw Jenkins' review and summarization of the complaints. See *Montana Land and Mineral Owners Ass'n, Inc. v. Devon Energy Corp.*, No. CV 05-30-H-DWM, 2006 WL 1876859 D. Mont. June 2, 2006) ("Testimony from the preparer of the summary usually is required to establish the foundational facts necessary to establish relevance and authentication"); see also *United States v. Grajales-Montoya*, 117 F.3d 356, 361 (8th Cir. 1997) (Rule 1006 summaries must be prepared by a witness who is available for cross-examination); *United States v. Behrens*, 689 F.2d 154, 161 (10th Cir.) (stating that a proper foundation for an evidentiary summary can be laid through the testimony of a witness who supervised the preparation of the exhibit), cert. denied, 459 U.S. 1088 (1982). Because there is no indication that Wong has foundational knowledge regarding Jenkins' preparation of the summary, the exhibit must be excluded.

[73]Mathews Decl. I, ¶ 11.

[74]Staid Decl. I, ¶ 21.

22

the increased workload, cash processors worked substantial overtime. Mathews reports that it was not unusual for her to work 30-40 hours of overtime per pay period during her first year at Litton, before the company started using an automated system to process payments. Even after the automated system came online, she regularly worked 15-25 hours of overtime each pay period.[75] Mathews estimates that the amount of work exceeded department capacity by 30 to 40 percent.[76]

Murray asserts that the research department, like the cash management department, was "grossly understaffed." At no time during her employment were there more than six research specialists, and at one point, Murray was the only research specialist on the company's payroll. When Murray left Litton in 2005, there were three research specialists. She contends that the workload was so overwhelming at one point that her supervisor instructed her to "throw away complaints because [she] could not possibly research all of them." Murray followed her supervisor's instructions and threw the complaints in the trash.[77] Murray states that the staffing crunch was further exacerbated in 2003 or 2004 when the research department began limiting research specialists to a hour of overtime per day. Because there was no concomitant drop in her workload, Murray was forced to cut corners in her work.[78]

Both Murray and Mathews contend they received insufficient training. Mathews received no formal training, and her informal training lasted only one day.[79] Murray reports that the three days of training she received were not adequate, and that she had to "learn a great deal about [her] job through . . . trial and error," resulting in more mistakes and lower efficiency.[80]

---

[75]Mathews Decl. I, ¶ 13.

[76]*Id.*, ¶ 14.

[77]*Id.*, ¶¶ 11-12.

[78]*Id.*, ¶ 14.

[79]Mathews Decl. I, ¶ 10.

[80]Murray Decl. I, ¶ 15.

23

1

### 3.    Litton's Response To Plaintiffs' Evidence Of Liability

2    In response to plaintiffs' evidence, Litton proffers the declarations of several of its
3    executives, who address the company's policies and procedures regarding late fees, collection of
4    past due amounts, loss mitigation, default, cash management, and lender-placed insurance. Senior
5    Vice President of Default Administration Staid states, for example, that "Litton does not impose
6    a late fee for any full payment received within the 'grace period' after the contractual due date";[81]
7    that "Litton does not charge a late fee for any timely payment made to the prior servicer within
8    60 days after loan transfer";[82] and that "Litton does not engage in making 'threats' of
9    foreclosure."[83]

10    Staid also describes Litton's "comprehensive training programs" for employees, including
11    computer-based training modules, web-based courses, and classroom instruction. He asserts that
12    all employees must attend twenty hours of training per year, and that there are over ninety training
13    courses available.[84]    Joseph Laigaie, Litton's Vice President of Investor Accounting and Cash
14    Management, states that "[a]ll employees in the cash management department, including Ms.
15    Mat[hews] were required to go through [a] formal training course [and] at least 40 hours of on
16    the job department training with an experienced instructor."[85]

17    Litton's declarants question the Murray's and Mathews' veracity.  Laigaie, for example,
18    asserts: "Ms. Mat[hews] states that Litton's system 'regularly had problems applying payments
19    correctly if the borrower paid any amount other than the exact regular payment amount.'  This

20

21

22    _____

23    [81]Staid Decl. I, ¶ 38.

24    [82]Id., ¶ 49.

25    [83]Id., ¶ 87.

26    [84]Id., ¶ 95.

27    [85]Declaration of Joseph Laigaie in Opposition to Plaintiffs' Motion for Class Certification
28    ("Laigaie Decl."), ¶ 34.

1   is not true. Our system is able to handle any amount that is paid by the borrower."[86] He also

2   states: "Ms. Mat[hews] states that 'the cash management department did not grow enough to keep

3   up with the increased workload.' . . . This is not true. While the number of payments that Litton

4   receives each month has certainly increased since 2001, we have kept up with the increase by

5   substantially enhancing the efficiency of our lock-box system and exceptions processes . . . and

6   through increased staffing."[87]

7         None of these declarations rebuts the inference raised by plaintiffs' declarations that,

8   whatever the company's policies, they have not been implemented in a way that adequately

9   ensures accurate loan servicing. While Staid asserts that all cash management employees are

10   required to undergo a training course and 40 hours of on-the-job training, for example, he

11   provides no evidence rebutting Mathews' assertion that she was not in fact given such training.

12   Despite Laigaie's conclusory assertion that Litton's automated system "is able to handle any

13   amount that is paid by the borrower," the issue is not the general capabilities of the system, but

14   whether the software regularly misapplied payment amounts that differed from the borrower's

15   regular payment amount. The strongly-worded customer complaints submitted by plaintiffs,

16   moreover, belie Staid and Laigaie's general assertions, which demonstrate, at most, the way

17   Litton loans were *supposed* to be serviced, rather than the way they actually were.[88]

18         C.    **Ascertainability And Scope Of The Proposed Nationwide Class**

19         "Although [i]t is not necessary that the members of the class be so clearly identified that

20   any member can be presently ascertained, . . . [plaintiffs] must establish that there exists a legally

21   definable class that can be ascertained through reasonable effort." *Rhodes v. Cracker Barrel Old

22   Country Store, Inc.*, 213 F.R.D. 619, 674 (N.D. Ga. 2003). As recently explained by Judge

23   Conlon of the Northern District of Illinois:

24   ───────────────

25         [86]*Id.*, ¶ 36.

26         [87]*Id.*, ¶ 37.

27         [88]See Wong Decl., Exhs. 22-33 (copies of Presidential Complaints); Jenkins Decl., Exhs.

28   C-D (copies of complaints submitted in support of plaintiffs' renewed motion).

1    "The class description must be sufficiently definite to permit ascertainment of class

2    members, and 'the description must not be so broad as to include individuals who

3    are without standing to maintain the action on their own behalf.'    Proper

4    identification of the proposed class serves two purposes.    First, it alerts the court

5    and parties to the potential burdens class certification may entail.    'In this way the

6    court can decide whether the class device simply would be an inefficient way of

7    trying the lawsuit for the parties as well as for its own congested docket.'    Second,

8    proper class identification insures that those individuals actually harmed by

9    defendant's wrongful conduct will be the recipients of the awarded relief."    *Oshana*

10    *v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005) (citations

11    omitted).

12    See also *O'Connor*, 184 F.R.D. at 319 (a class need not be "so ascertainable that every potential

13    member can be identified at the commencement of the action"; rather, it is enough that the class

14    definition be sufficiently definite "so that it is administratively feasible for the court to ascertain

15    whether an individual is a member").

16        As noted, plaintiffs seek certification of a Nationwide Class of borrowers who have claims

17    against Litton for violation of 12 U.S.C. § 2605(d), a provision of RESPA.    This provision

18    creates a 60-day grace period following the transfer of servicing of a mortgage loan, and prohibits

19    loan servicers from imposing late fees or otherwise treating as late any payment that was

20    "received by the transferor servicer (rather than the transferee servicer who should properly

21    receive payment) before the due date applicable to such payment."    12 U.S.C. § 2605(d).[89]    In

22

23    ───────────────────

24        [89]Complaint, ¶ 112.    The complaint also alleges that Litton has violated 12 U.S.C.
§ 2605(c), which requires that transferee loan servicers advise borrowers of a transfer within 15
25    days of its effective date, or within 30 days if the transfer is preceded by a "for cause"
termination of the contract for servicing, by the servicer's commencement of bankruptcy
26    proceedings, or by the commencement of conservatorship or receivership proceedings by the
FDIC or the Resolution Trust Corporation related to the servicer (or an entity that owns or
27    controls the servicer). (*Id.*).    Plaintiffs do not seek certification of a class of borrowers who claim
28    violation of § 2605(c), however.    (See Mot. at 1:9-14).

1   a class action alleging violation of § 2605, RESPA permits the recovery of "actual damages to

2   each of the borrowers in the class." Additionally, where plaintiffs prove "a pattern or practice

3   of noncompliance" with § 2605, the statute permits "additional damages, as the court may allow

4   . . . in an amount not greater than $1,000 for each member of the class," so long as total damages

5   do not exceed the lesser of $500,000 or one percent of the servicer's net worth.  12 U.S.C.

6   § 2605(f)(2).  Plaintiffs initially requested that the court certify a nationwide § 2605 class of

7          "[a]ll persons (i) who presently own, or during the Class Period owned, property

8          (including mobile homes) in the United States, and (ii) who entered into a mortgage

9          loan transaction which was then transferred or sold to Litton or for which the

10         servicing rights were acquired by Litton Loan Servicing, LP or its predecessors,

11         directly or indirectly, at any time between October 26, 2002, and the present."[90]

12         Litton objected to plaintiffs' class definition on overbreadth and ascertainability grounds.

13  It argued that plaintiffs had failed to provide evidence "as to how their purported RESPA claim

14  applies to [Litton's more than] 860,000 borrowers" nationwide, and asserted that it would be

15  "nearly impossible" to identify which of those borrowers have RESPA claims, since this "would

16  require reviewing each loan file to determine which customers might have been assessed . . .

17  erroneous late fees. . . ."[91]

18         In its tentative order, the court agreed with Litton that plaintiffs' proposed definition of a

19  Nationwide Class was overbroad and imprecise because it encompassed individuals who were

20  never assessed late fees by Litton.  See *Owner-Operator Independent Drivers Ass'n, Inc. v. Swift*

21  *Transp.*, No. CV-02-1059-PHX-PGR, 2006 WL 2521183, *1 (D. Ariz. Mar. 30, 2006) (stating

22  that a class definition is overbroad if it "include[s] members who have no actual claims against

23  [defendants] under the plaintiffs' own legal theories"); *O'Connor*, 184 F.R.D. at 319 (a class

24  definition must be "precise, objective and presently ascertainable"); *Newman v. CheckRite*

25  *California, Inc.*, No. Civ. S-93-1557 LKK, 1996 WL 1118092, *3 (E.D. Cal. Aug. 2, 1996) (a

26  _____

27      [90]Complaint, ¶ 30.

28      [91]Opp. at 9:9-13.

1  class definition is "too general when 'it would require the court to determine whether a person's
2  legal rights had actually been violated in order to determine whether that person was a class
3  member'" (citations omitted)).

4      The court noted that it did not need to deny certification simply because the proposed class
5  definition was overly broad, however, as district courts can redefine a class to make its parameters
6  more precise. See *Lundquist v. Security Pacific Automotive Financial Services Corp.*, 993 F.2d
7  11, 14 (2d Cir. 1993) ("the district court 'is not bound by the class definition proposed in the
8  complaint and should not dismiss the action simply because the complaint seeks to define the class
9  too broadly'" (citations omitted)); *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 64 (D. Nev.
10 1985) (observing that "many circuits have held that the court itself may construct a definition of
11 a class . . . or may modify a proposed definition where the original is inadequate" and adopting
12 a judicially modified class definition).

13     Noting that plaintiffs sought certification of a nationwide class under § 2605(d) and its
14 implementing regulations,[92] the court tentatively indicated a willingness to certify a class of
15 borrowers who, despite having made a timely payment to their prior loan servicer, had been
16 assessed a late fee within the first 60 days after the transfer of their loans to Litton. Specifically,
17 the court indicated that it was prepared to certify a Nationwide Class defined as follows:[93]

18     "All persons (i) who presently own, or during the Class Period owned, property
19     (including mobile homes) in the United States, (ii) who entered into a mortgage
20     loan transaction which was then transferred or sold to Litton or for which the
21     servicing rights were acquired by Litton Loan Servicing, LP or its predecessors,
22     directly or indirectly, at any time between October 26, 2002, and the present, and
23     (iii) who made timely payment to the transferor servicer and were charged late fees

24

25  ————————————
26  [92]Mot. at 1:9-14. The complaint, by contrast, alleges that defendant violated § 2605(d) and
    "other provisions of RESPA." (Complaint, ¶ 112.)

27  [93]This definition is drawn in part from an alternative class definition proposed by plaintiffs
28  in their reply brief. (See Reply at 4 n. 2.)

1   related to that payment within the first sixty (60) days of the loan transfer to

2   Litton."

3       Litton contends that, even as narrowed, "a loan by loan review" will be required to

4   determine "(1) which customers were charged late fees within 60 days of loan transfer, and

5   (2) . . . whether the customer [charged such fees] paid his or her monthly payment on a timely

6   basis to the prior servicer."[94]  As an example of the difficulties involved in identifying class

7   members, Litton recites facts related to the Durands' claim.  Staid concedes that Litton charged

8   the Durands a late fee on June 17, 2002,[95] less than 60 days after their loan had been transferred

9   to Litton for processing in May 2002.[96]  At the time, Litton had no evidence that the Durands had

10  made a timely payment to the prior servicer, and  Staid contends it was not until February 23,

11  2004 that the Durands gave Litton a cancelled check showing timely payment.[97]  Given the myriad

12  factual circumstances surrounding individual loans, Litton maintains that determining the identity

13  of individual members of the class will be unduly burdensome.

14      Litton's records will readily reveal the identity of borrowers who were assessed a late fee

15  within 60 days of loan transfer.  Once the pool of potential class members has been narrowed in

16  this fashion, the burden of identifying class members will be considerably reduced.  The court

17  recognizes that a loan-by-loan review, even of a limited pool of potential class members, may be

18  time-consuming and/or costly.  Numerous courts have concluded that such burdens do not render

19  a class unascertainable however, so long as the members can be identified using objective criteria.

20  That requirement is met here.  See, e.g., *DeHoyos v. Allstate Corp.*, 240 F.R.D 269, 299 (W.D.

21  Tex. 2007) (finding that a class was ascertainable because once class members self-reported their

22  race and/or national origin, their names could "be cross referenced with [defendant's] records to

23

24  _____

25  [94]Opp. at 12:23-27.

26  [95]Staid Decl. II, ¶ 83.

27  [96]Durand Decl., ¶ 5.

28  [97]Staid Decl. II, ¶ 88.

29

1  determine if they satisf[ied] the remainder of the class definition (e.g., whether their credit

2  information resulted in [defendant] charging them a higher [insurance] premium)"); *Foreman v.*

3  *PRA III, LLC*, No. 05 C 3372, 2007 WL 704478, *5 (N.D. Ill. Mar. 5, 2007) ("All four of the

4  bases upon which an individual may qualify for the proposed class can be ascertained by

5  examining the Defendants' file on each of the potential class members for the presence of

6  particular documents or information and other objective criteria"); *Dunnigan v. Metropolitan Life*

7  *Ins. Co.*, 214 F.R.D. 125, 135 (S.D.N.Y. 2003) ("Even if MetLife is unable to run the database

8  on the older statistical information, the class can be identified through an examination of the

9  individual files of each of the participants. The fact that this manual process may be slow and

10  burdensome cannot defeat the ascertainability requirement"); *Elliott v. ITT Corp.*, 150 F.R.D

11  569, 575 (N.D. Ill. 1992) ("Here, inclusion in the class turns on the presence or absence of

12  documentary evidence that a potential plaintiff was advised in advance of their loan closing that

13  insurance was optional. Since this initial determination of class membership may be made by

14  reviewing loan files, it is administratively feasible to ascertain the identities of class members").

15  Consequently, the court concludes that its modified definition of the Nationwide Class satisfies

16  the ascertainability requirement.

17      **C.    Whether Plaintiffs Have Satisfied the Requirements of Rule 23(a)**

18          **1.    Numerosity**

19      Under the Federal Rules of Civil Procedure, before a class can be certified, the court must

20  determine that the class is "so numerous that joinder of all members is impracticable." See

21  FED.R.CIV.PROC. 23(a). "Impracticability does not mean impossibility, [however,] . . . only . . .

22  difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine*

23  *Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (internal quotations omitted). There is no

24  set numerical cutoff used to determine whether a class is sufficiently numerous; courts must

25  examine the specific facts of each case in evaluating whether the requirement has been satisfied.

26  See *General Tel. Co. v. EEOC*, 446 U.S. 318, 329-30 (1980). "As a general rule, [however,]

27  classes of 20 are too small, classes of 20-40 may or may not be big enough depending on the

28  circumstances of each case, and classes of 40 or more are numerous enough." *Ikonen v. Hartz*

*Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) (citing 3B J. Moore & J. Kennedy, MOORE'S FEDERAL PRACTICE ¶ 23-05[1] (2d ed. 1987)). "'Where the exact size of the proposed class is unknown, but general knowledge and common sense indicate it is large, the numerosity requirement is satisfied.'" *In re HiEnergy Technologies, Inc. Sec. Litig.*, No. CV 08-1226 DOC (JTLx), 2006 WL 2780058, *3 (C.D. Cal. Sept. 26, 2006) (quoting *In re Intermec Corp. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 96, 178 (W.D. Wash. 1991)).

Litton acknowledges that it has serviced more than 860,000 residential mortgage loans nationwide since October 2001.[98] This number far exceeds the threshold typically required to satisfy the numerosity requirement. See *Johnson v. GMRI, Inc.*, No. CV-F-07-0283 LJO DLB, 2007 WL 963209, *7 (E.D. Cal. Mar. 29, 2007) ("Generally, 40 or more members will satisfy the numerosity requirement"); *Lundell v. Dell, Inc.*, No. CIVA C05-3970 JWRS, 2006 WL 3507938, *1 (N.D. Cal. Dec. 5, 2006) (finding that a nationwide class of 380,000 members satisfied the numerosity requirement because "it would be wholly impracticable, if not impossible, to join individual members of a class of this size and geographic dispersion"). This figure cannot form the basis for a finding of numerosity, however, as there is no indication what percentage of the 860,000 borrowers were charged a late fee within the first 60 days after loan transfer even though they made timely payment to a prior servicer.

As a result, the court directed plaintiffs to file further evidence regarding the numerosity of the revised Nationwide Class. In their evidentiary submission, plaintiffs include interrogatory responses in which Litton acknowledges that it assessed (and did not waive) late fees within the first 60 days of loan transfer on 128,906 borrowers between 2002 and 2006.[99] Plaintiffs acknowledge that some of these borrowers are not within the class because they did not make a timely payment to a prior mortgage servicer. They argue, however, that the court may infer from

_____

[98]Wong Decl., Exh. 35 (Defendant's Objections and Second Supplemental Answers to Plaintiff's First Set of Interrogatories at No. 1).

[99]Declaration of Heather Wong in Support of Plaintiffs' Submission of Additional Evidence Regarding the Numerosity of the Proposed Nationwide RESPA Class ("Wong Decl. II"), Exh. 1.

31

1    circumstantial evidence in the record that at least 40 or more of the 128,906 borrowers were
2    assessed late fees within the first 60 days even though they made timely payments to prior
3    servicers.

4         As support for this proposition, plaintiffs cite the previously-submitted declarations of 14
5    putative class members, all of whom attest that they were charged late fees by Litton soon after
6    loan transfer even though they made a timely payment to the prior servicer.  Putative class
7    member Pamela Alonso, for example, states:

8        "At the time Litton notified us that the loan had transferred to it, Litton sent us
9        notification that we were delinquent on two payments that we made to our previous
10       mortgage holder, PFS.  We have extensive documentation that shows we never
11       missed a payment and were in good standing with PFS at the time the loan
12       transferred to Litton.  Despite our efforts to prove otherwise, LItton maintained that
13       we failed to make two payments to PFS.  [¶]  Based on its contention that we
14       missed payments to PFS, Litton immediately began charging us late fees when the
15       loan transferred to it.  [¶]  We notified Litton in writing that we consistently made
16       timely monthly payments . . . to PFS Mortgage. . . .  Litton ignored our written
17       request [to remove the late fees] and beg[a]n to send letters of default from that
18       time forward.  [¶]  Over the phone, a Litton customer service representative told
19       my husband he was a liar and a deadbeat.  The representative also said Litton was
20       going [to] get our house and would prove to us they could do it."[100]

21

22    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[100]Declaration of Heather H. Wong . . . in Support of Plaintiffs' Submission of Additional
Evidence Regarding the Numerosity of the Proposed Nationwide RESPA Class ("Wong Decl.
III"), Exh. C (Alonso Decl., ¶¶ 7-10).  Litton objects to this evidence, as well as to the evidence
cited *infra* in footnote 102.  These objections are overruled.  Although plaintiffs resubmitted the
declarations in question in support of their supplemental submission, the evidence was already in
the record, as it was originally proffered in support of plaintiffs' motion for class certification.
Consequently, Litton cannot claim that it has been prejudiced by purportedly "late-filed"
evidence.  Litton's objections appear motivated by a desire to secure an opportunity to "respond"
to the allegations in the consumer declarations as its *initial* response to the evidence – a 391-
paragraph declaration with 74 exhibits totaling 600 pages – was stricken by the court for failure

32

1    The court agrees that Alonso's complaints, which are echoed by each of the remaining 13

2    declarants,[101] constitute circumstantial evidence that supports a finding of numerosity. In addition,

3    Murray explains that "it was common for borrowers to make their mortgage payment to their

4    previous lender after their loan transferred."[102] When this occurred, Murray reports, "Litton did

5    not apply the payment to the borrower's account," but "considered the borrower to be in

6    default."[103] She asserts that Litton "frequently" lacked access to payment information from prior

7    lenders.[104] Murray's statements, together with the fact that more than 128,000 loans were

8    assessed late fees within the first 60 days of loan transfer between 2002 and 2006, provides a

9    sufficient basis for inferring that at least 40 individuals fall within the revised Nationwide Class.

10   See *Elliott*, 150 F.R.D. at 567-77 ("The finding of numerosity may be supported by common

11   sense assumptions. . . .  In this court's view, the fact that a number of class actions have

12

13   to comply with court orders.  (Docket No. 108).  The court will not countenance attempts to

14   circumvent its earlier order striking Litton's responsive declaration. (See Docket No. 137).

15   [101]See *id.*, Exh. C (Anderson Decl., ¶¶ 8, 11, Barnaby Decl., ¶¶ 7-12, Budd Decl., ¶¶ 6-
16   9, Clevenger-Stoner Decl., ¶¶ 7-12, De Matteo Decl., ¶¶ 6-8, 13, Dilworth Decl., ¶¶ 7-8, 12,
17   Durand Decl., ¶¶ 8-15, Felt Decl., ¶¶ 8-12, Kruse Decl., ¶¶ 8-10, Maniff Decl., ¶¶ 7-8, 10,
     Miles Decl., ¶¶ 7-8, 10, Perry Decl., ¶¶ 7-9, 11, Stromberg Decl., ¶¶ 7-9).

18   [102]*Id.*, Exh. B (Murray Decl., ¶ 7).

19   [103]*Id.*, ¶ 8.

20   [104]*Id.*, ¶ 10.  Litton objects to plaintiffs' reliance on these portions of Murray's declaration,
21   asserting that they contradict Murray's deposition testimony, given on June 12, 2007. Murray
22   testified that, when a customer complained that Litton had not applied payments made to a prior
     servicer, she would either try to find the record or instruct the borrower to get the payment from
23   the prior servicer. (See Litton's Objections to Plaintiffs' . . . Submission of Additional Evidence
24   at 4-5 (citing Declaration of R. Bruce Allensworth in Support of Litton's Opposition to Plaintiffs'
     Renewed Motion for Class Certification, Exh. A (Deposition of Debra Murray at 211:22-
25   212:12))).  Nothing in this testimony contradicts Murray's assertion (1) that it was "common for
26   borrowers to make their mortgage payment to their previous lender after their loan transferred,"
     (2) that "Litton did not apply the payment to the borrower's account" in such situations but
27   "considered the borrower to be in default" and (3) that Litton "frequently" lacked access to
     payment information from prior lenders. (See Murray Decl., ¶¶ 7, 8, 10). Litton's objection is
28   therefore overruled.

challenged defendants' alleged practices, combined with the number of loans potentially at issue, provide a sufficient basis from which one could conclude that numerosity is satisfied"). In addition, the court notes that the impracticability of joinder in this case is heightened by the geographic dispersion of the nationwide class members and by the small amount that each individual borrower could recover under § 2605(d). See *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (considerations relevant to the practicability of joinder include "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members" (citations omitted)); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559-60 (8th Cir. 1982) (in determining numerosity, the court may consider "the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the putative class members"); *Marcera v. Chinlund*, 91 F.R.D. 579, 583 (W.D.N.Y. 1981) ("While thirty-five class members do not comprise a tremendously large group, the impracticability of joinder is substantial because the [class members] are scattered throughout the state. The numerosity test is therefore met"). For these reasons, the court concludes that plaintiffs have carried their burden of showing that the Nationwide Class satisfies the numerosity requirement.

### 2. Commonality

Commonality requires "questions of law or fact common to the class." See FED.R.CIV.PROC. 23(a)(2). The commonality requirement is construed liberally, and the existence of some common legal and factual issues is sufficient to satisfy the requirement. *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1320 (9th Cir. 1982); accord *Hanlon*, 150 F.3d at 1019 ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively"); see also, e.g., *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989) ("Unlike the 'predominance' requirement of Rule 23(b)(3), Rule 23(a)(2) requires only that the class movant show that a common question of law or fact exists; the movant need not show, at

1    this stage, that the common question overwhelms the individual questions of law or fact which

2    may be present within the class"). As the Ninth Circuit has noted: "All questions of fact and law

3    need not be common to satisfy the rule. The existence of shared legal issues with divergent

4    factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal

5    remedies within the class." *Hanlon*, 150 F.3d at 1019.

6         Under the Ninth Circuit's liberal commonality standard, plaintiffs have adequately

7    demonstrated the commonality of the claims asserted by Nationwide Class members. Members

8    of the class assert a single claim under RESPA, 12 U.S.C. § 2605(d), which prohibits Litton from

9    charging late fees within 60 days after a loan is transferred to it for servicing if the late fees are

10    related to a payment that was timely made to a prior servicer. The statute permits the recovery

11    of actual damages, and, if plaintiffs prove that Litton has a practice or pattern of violating

12    § 2605(d), statutory damages of not more than $1,000 per class member. See 12 U.S.C.

13    § 2605(f)(2)(B).

14         Resolution of the Nationwide Class members' RESPA claim turns on common issues:

15    whether Litton violated § 2605(d) by charging prohibited late fees and whether it had a pattern

16    or practice of noncompliance with § 2605(d). Litton's arguments to the contrary center on the

17    difficulty of ascertaining the members of the class, not on a lack of commonality in their claims.

18    Litton asserts, for example, that "[p]laintiffs . . . offer no suggestion as to how the Court could

19    identify [Nationwide Class members] without a loan by loan review as to (1) which customers

20    were charged late fees within 60 days of loan transfer, and (2) . . . whether the customer paid his

21    or her monthly payment on a timely basis to the prior servicer."[105]

22         Whatever merit this argument may have in assessing the manageability of the class, it does

23    not undermine a finding of commonality, which requires only that class members "share[ ] legal

24    issues with divergent factual predicates," or "share a common core of salient facts" that support

25    "claims for relief on different legal theories." *Dukes II*, 474 F.3d at 1225; see also *Hanlon*, 150

26    F.3d at 1019. The claims of the Nationwide Class members share a common core of facts, i.e.,

27

28         [105]Opp. at 12:23-27.

35

1  Litton's practices and patterns with respect to late fees imposed within the first 60 days after loan

2  transfer. They also share common legal issues, i.e., whether Litton's actions violated § 2605(d)

3  and/or constituted a "practice or pattern" under § 2605(f). Accordingly, commonality is satisfied

4  as to the Nationwide Class.

5        **3.    Typicality**

6        Typicality requires a determination as to whether the named plaintiff's claims are typical

7  of those of the class members he seeks to represent.    See FED.R.CIV.PROC. 23(a)(3).

8  "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent

9  class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; *see also*

10 *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985) ("A plaintiff's claim meets this

11 requirement if it arises from the same event or course of conduct that gives rise to claims of other

12 class members and the claims are based on the same legal theory").

13       "The test of typicality is whether other members have the same or similar injury, whether

14 the action is based on conduct which is not unique to the named plaintiffs, and whether other class

15 members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (citation

16 and internal quotations omitted). Typicality, like commonality, is a "permissive standard[ ]."

17 *Hanlon*, 150 F.3d at 1020. Indeed, in practice, "[t]he commonality and typicality requirements

18 of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157 n. 13. Typicality may be found lacking,

19 however, "if 'there is a danger that absent class members will suffer if their representative is

20 preoccupied with defenses unique to it.'" *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic*

21 *Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.

22 1990)); *see also J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir.

23 1980) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the

24 plaintiff class may destroy the required typicality of the class as well as bring into question the

25 adequacy of the named plaintiff's representation").

26       The Durands are the only named plaintiffs who, within 60 days of loan transfer, were

27

28

1  assessed late fees that related to a payment timely made to the prior servicer.[106] Litton contends

2  that the Durands' claim is atypical because it is barred by RESPA's three-year statute of

3  limitations.  See 28 U.S.C. § 2614 ("Any action pursuant to the provisions of section 2605 . . .

4  of this title may be brought in the United States district court . . . for the district in which the

5  property involved is located, or where the violation is alleged to have occurred, within 3 years").

6  Specifically, Litton notes that the late fee on which the Durands' claim is based was assessed on

7  June 17, 2002, more than three years before this lawsuit was filed on October 26, 2005.  Plaintiffs

8  acknowledge that § 2614's three-year statute of limitation applies, but contend it should be tolled

9  under the fraudulent concealment doctrine.

10         The fraudulent concealment doctrine is equitable and is presumptively read into every

11  federal statute of limitations.  *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946); see also

12  *Hallstrom v. Tillamook County*, 493 U.S. 20, 27 (1989) ("The running of . . . statutes [of

13  limitations] is traditionally subject to equitable tolling"); *Cada v. Baxter Healthcare Corp.*, 920

14  F.2d 446, 451 (7th Cir. 1990) ("The rule in the federal court is that both tolling doctrines –

15  equitable estoppel and equitable tolling – are . . . grafted on to federal statutes of limitations").

16  The general presumption is rebutted, however, if the statute of limitations is jurisdictional.  See

17  *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1166 (7th Cir. 1997) ("The

18  practical meaning of a jurisdictional limitation is that the court must enforce it regardless of any

19  agreement between or conduct by the parties; it is not only for their protection.  Statutes of

20  limitation are ordinarily for the protection of defendants and so can be waived or forfeited by

21

_____

22         [106]In reply, plaintiffs assert that the Saulniers, too, have claims typical of the Nationwide

23  Class members.  Mary Beth Saulnier's declaration does not support this assertion, however.  She

24  states that her loan was transferred to Litton on October 2, 2003, that she made timely October
    and November 2003 payments to Litton, and that she was later informed that her account was past

25  due for those months.  (Saulnier Decl., ¶¶ 5-6).  Ms. Saulnier does not state that she and her

26  husband were assessed late fees within 60 days after transfer for a payment they timely made to
    their prior servicer.  In their reply, plaintiffs attach a copy of the Saulniers' check for a September

27  2003 payment, made out to their former servicer, Fremont.  (Alexander Decl., Exh. 5).  There
    is no indication that Litton charged the Saulniers late fees for their September 2003 payment,

28  however.

1   them").

2       In *Hardin v. City Title & Escrow Co.*, 797 F.2d 1037 (D.C. Cir. 1986), the D.C. Circuit

3   concluded that "the time limitation contained in § 2614 [is] a jurisdictional requirement . . . [that]

4   is not subject to equitable tolling under the doctrine of fraudulent concealment." *Id.* at 1039. In

5   reaching this conclusion, the court noted that § 2614's time limitation "is an integral part of the

6   same sentence that creates federal and state court jurisdiction," and that Congress titled the

7   section, "JURISDICTION OF COURTS." *Id.* (citing Pub.L. No. 93-534, § 16, 88 Stat. 1724,

8   1731 (1974)). The court also observed the § 2614 was "identical in all material respects to 15

9   U.S.C. § 1640(e), the time limitation applicable to the Truth in Lending Act," which some courts

10  have held to be jurisdictional. *Hardin*, 797 F.2d at 1039 (citing *Rust v. Quality Car Corral, Inc.*,

11  614 F.2d 1118, 1119 (6th Cir. 1980)).

12      Other courts have disagreed. See *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118

13  F.3d 1157, 1166-67 (7th Cir. 1997) (declining to following *Hardin*); *Carr v. Home Tech Co.,*

14  *Inc.*, No. 03-2569, 2007 WL 678637, *8 (W.D. Tenn. 2007) ("Federal statutes of limitation like

15  those under RESPA are subject to the equitable tolling doctrine"); *Pedraza v. United Guar.*

16  *Corp.*, 114 F.Supp.2d 1347, 1353 (S.D. Ga. 2000) (tolling RESPA's limitations period); *Kerby*

17  *v. Mortgage Funding Corp.*, 992 F.Supp. 787, 797 (D. Md. 1998) ("I hold that the limitations

18  periods in RESPA and TILA are subject to the doctrine of equitable tolling"); *Moll v. U.S. Life*

19  *Title Ins. Co. of New York*, 700 F.Supp. 1284, 1286-88 (S.D.N.Y. 1988) (reversing, on motion

20  for reconsideration, its earlier conclusion that § 2614 is jurisdictional and not subject to equitable

21  tolling).

22      The Ninth Circuit has not addressed whether RESPA's statute of limitations can be

23  equitably tolled. In *King v. California*, 784 F.2d 910 (9th Cir. 1986), however, the court applied

24  equitable tolling to TILA's statute of limitations, which, as the *Hardin* court noted, is "identical

25  in all material respects" to § 2614. "To determine whether equitable tolling should apply" to a

26  statute, the *King* court explained, the "basic inquiry is whether tolling the statute in certain

27  situations will effectuate the congressional purpose of the [Act]." *Id.* at 915. After reviewing

28  TILA's legislative history, the Ninth Circuit concluded that Congress' purpose in enacting TILA

1   was to guard against fraudulent practices stemming from the uninformed use of credit. Its aim,

2   the court stated, was to create a remedial statute that must be interpreted liberally in the

3   consumer's favor. *Id*. Consequently, the *King* court determined that TILA's limitations period

4   could be equitably tolled under the fraudulent concealment doctrine. *Id*.

5          Like TILA, RESPA is a consumer protection statute. 12 U.S.C. § 2601(a) expressly states

6   that the statute's purpose is "to protect consumers . . . from unnecessarily high settlement charges

7   caused by certain abusive practices that have developed in some areas of the country." Its

8   legislative history confirms that the statute is intended to be remedial. See S. Rep. 93-866 (1974),

9   reprinted in 1974 U.S.C.C.A.N. 6546 (RESPA was enacted to address three problem areas,

10  including (1) "[a]busive and unreasonable practices within the real estate settlement process that

11  increase settlement costs to home buyers without providing any real benefits to them" and

12  (2) "[t]he lack of understanding on the part of most home buyers about the settlement process and

13  its costs").

14         Given this remedial purpose, the court concludes that like TILA's goals, RESPA's goals

15  would not be served by precluding consumers from asserting equitable tolling in response to a

16  statute of limitations defense. See *Mullinax v. Radian Guar. Inc.*, 199 F.Supp.2d 311, 328

17  (M.D.N.C. 2002) ("it is important to note that RESPA is a remedial statute that was designed for

18  the 'elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of

19  certain settlement services.' . . . Given this purpose, it would be incongruent to treat RESPA's

20  time limitation as a jurisdictional bar 'reward[ing] those perpetrators who concealed their fraud

21  long enough to time-bar their victims' remedy'"); *Rawlings v. Dovenmuehle Mortg., Inc.*, 64

22  F.Supp.2d 1156, 1165 (M.D. Ala. 1999) (RESPA's statutory language and legislative history

23  "demonstrate that Congress intended RESPA to be a remedial consumer-protection statute. As

24  such, RESPA is to be 'construed liberally in order to best serve Congress' intent'"); *Moll*, 700

25  F.Supp. at 1288 (holding that RESPA's statute of limitations is subject to equitable tolling in part

26  because "RESPA's [remedial] purposes would be frustrated if its time limitation provision is read

27  to be a rigid jurisdictional prerequisite, and not as an ordinary statute of limitations. The

28  jurisdictional grant of power by Congress to the federal courts under RESPA is severely

39

1  undermined if a culpable party need only cover up fraud for one year to avoid the reach of the

2  statute").

3      That equitable tolling is available does not establish that the Durands can shown an

4  entitlement to tolling, however. The doctrine of fraudulent concealment "is properly invoked only

5  if a plaintiff establishes 'affirmative conduct upon the part of the defendant which would, under

6  the circumstances of the case, lead a reasonable person to believe that he did not have a claim for

7  relief.'" *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987) (quoting *Gibson*

8  *v. United States*, 781 F.2d 1334, 1345 (9th Cir. 1986)). Parties who seek equitable tolling must

9  not only "demonstrate that they had neither actual nor constructive notice of the facts constituting

10  their claims for relief," *id.* at 1415 (citing *Rutledge v. Boston Woven Hose & Rubber Co.*, 576

11  F.2d 248, 250 (9th Cir. 1978)), but also must show that the other party affirmatively misled or

12  concealed information from them. "[S]ilence or passive conduct does not constitute fraudulent

13  concealment." *Id.* at 1416; see also *Guerrero v. Gates*, 357 F.3d 911, 919 (9th Cir. 2004)

14  ("Equitable estoppel, also termed fraudulent concealment, halts the statute of limitations when

15  there is 'active conduct by a defendant, above and beyond the wrongdoing upon which the

16  plaintiff's claim is filed, to prevent the plaintiff from suing in time.' The plaintiff must

17  demonstrate that he relied on the defendant's misconduct in failing to file in a timely manner and

18  'must plead with particularity the facts which give rise to the claim of fraudulent concealment'").

19      Plaintiffs contend the Durands' claim should be equitably tolled because a Litton

20  representative affirmatively told Elaine Durand that their May 2002 payment (which she had made

21  to her prior servicer, Ocwen) had been transferred from Ocwen to Litton on June 19, 2002 and

22  that they would not be assessed late fees for the error.[107] Ms. Durand asserts that her monthly

23  mortgage statements did not reflect the assessment of late fees related to the May 2002 payment,

24  and that Litton never sent letters or notices informing her that it had assessed such fees.[108] Ms.

25

---

26      [107]Durand Decl., ¶ 10.

27      [108]Declaration of Elizabeth A. Alexander in Support of Reply Brief ("Alexander Decl."),

28  Exh. 5 (Declaration of Elaine Durand in Support of Plaintiffs' Reply ("Durand Decl. II"), ¶ 8).

1  Durand contends that it was not until February 2004, when the Durands attempted to refinance

2  their loan, that they learned Litton had never removed the late fee.[109]

3        The court agrees that these facts, if proven, may entitle the Durands to equitable tolling.

4  The question is whether this issue – which is unique to the Durands – is "serious and likely to

5  sidetrack the litigation to the detriment of the entire class." *Schwab v. Philip Morris USA, Inc.*,

6  449 F.Supp.2d 992, 1104 (E.D.N.Y. 2006); see also *Hanon*, 976 F.2d at 508 ("class certification

7  is inappropriate where a putative class representative is subject to unique defenses which threaten

8  to become the focus of the litigation"). The court concludes it is not.

9        First, "as a general matter, individualized defenses do not defeat typicality." *Ellis v.*

10 *Costco Wholesale Corp.*, __ F.R.D.__, 2007 WL 127800, *10 (N.D. Cal. Jan. 11, 2007); *Smith*

11 *v. Univ. of Wash. Law Sch.*, 2 F.Supp.2d 1324, 1342 (W.D. Wash. 1998) ("Typicality turns on

12 the defendant's actions toward the plaintiff class, not particularized defenses against individual

13 class members" (citations omitted)). Moreover, the Durands' claim to equitable tolling is

14 relatively straightforward and readily resolved on a limited set of facts, creating little danger that

15 it will "sidetrack the litigation" or "threaten to become the focus of the litigation." See

16 *Mortimore v. F.D.I.C.*, 197 F.R.D. 432, 437 (W.D. Wash. 2000) (finding that a statute of

17 limitations defense to which a putative class representative was subject did not defeat typicality,

18 because it "[could not] be said to be the major focus of [the] litigation"); *Getty v. Harmon*, No.

19 C98-178WD, 1998 WL 919368, *3 (W.D. Wash. Oct. 23, 1998) (finding that a statute of

20 limitations defense was not sufficient to defeat typicality because it did "not relate to all of the

21 named representatives, and [was] not so significant as to 'threaten to become the focus of the

22 litigation'"); *Anderson v. New Dimension Financial Services, L.P.*, No. 00 C 3725, 2001 WL

23 883700, *5 (N.D. Ill. Aug. 7, 2001) (finding that typicality was established and observing, in a

24 RESPA case, that the named plaintiffs' equitable tolling issues were not "so consuming . . . that

25 they would take the focus away from the merits of the case"); see also *Kronfeld v. Trans World*

26 *Airlines, Inc.*, 104 F.R.D. 50, 53 (S.D.N.Y. 1984) (finding that a representative's reliance on

27 _____

28   [109]*Id.*, ¶ 9.

41

1    a third party to purchase stock did not create a unique defense that made him an inadequate

2    representative for those class members who purchased the stock directly).

3         For these reasons, the court finds that Litton's statute of limitations defense to the Durands'

4    claim is not sufficient to overcome typicality. In all other respects, the Durands' claim is

5    substantially similar to the claims of other class members, as all claims are based on the same

6    alleged "practice or pattern" of charging late fees within the 60 days of loan transfer without

7    ascertaining whether a timely payment was made to the prior servicer. That the class members

8    have different loan histories does not alter this conclusion. See *Dukes II*, 474 F.3d at 1232 ("even

9    though individual employees in different stores with different managers may have received

10    different levels of pay and were denied promotion or promoted at different rates, because the

11    discrimination they allegedly suffered occurred through an alleged common practice – e.g.,

12    excessively subjective decision-making in a corporate culture of uniformity and gender

13    stereotyping – their claims may be sufficiently typical to satisfy Rule 23(a)(3)"). Because the

14    Durands "possess the same interest and suffer[ed] the same injury as the [remaining] class

15    members," their claims are typical of those of the Nationwide Class. *Ellis*, 2007 WL 127800 at

16    *10.

17         **4.    Adequacy Of Representation**

18         The adequacy of representation requirement set forth in Rule 23(a)(4) involves a two-part

19    inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other

20    class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously

21    on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

22         Litton asserts that "the purely individualized issues crucial to the resolution of each named

23    plaintiff's claims"[110] necessarily prevent them from adequately representing the proposed classes.

24    This argument restates Litton's objections to commonality and typicality, and is rejected for the

25    reasons stated *infra*.

26         Litton next argues that plaintiffs' attorneys "have an irreconcilable conflict [due to] their

27

28         [110]Opp. at 23:11.

1   representation of the *All* [*v. Litton Loan Servicing, LP*] class."[111] *All* is a putative class action

2   filed by plaintiffs Stephen All and Jo Dee Koller against Litton in San Francisco Superior Court.

3   Like plaintiffs in this action, All and Koller are represented by Lieff, Cabraser, Heimann &

4   Bernstein, LLP, and by Cotchett, Pitre & McCarthy.

5       "The responsibility of class counsel to absent class members whose control over their

6   attorneys is limited does not permit even the appearance of divided loyalties. . . ." *Kayes v.*

7   *Pacific Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995). In keeping with this principle, some

8   courts have concluded that class counsel are not adequate if they represent a second set of

9   plaintiffs in a parallel action. See, e.g., *Allen v. Stewart Title Guar. Co.*, Nos. 06-cv-2426,

10  06-cv-4534, 2007 WL 119953, *2 (E.D. Pa. Jan. 9, 2007) (refusing to appoint an attorney as

11  interim class counsel because the attorney already represented a similar class of plaintiffs against

12  the same defendant on a similar claim in state court, and noting that "[t]his multiple representation

13  may result in competing interests between the two proposed classes, and as such, could create an

14  appearance of conflict"); *Kuper v. Quantum Chem. Corp.*, 145 F.R.D. 80, 83 (S.D. Ohio 1992)

15  (concluding that the possibility that the defendant's assets might not be sufficient to respond to

16  judgments in both actions being handled by counsel gave rise to a conflict of interest that impaired

17  their ability to pursue vigorously the interests of both classes); *Jackshaw Pontiac v. Cleveland*

18  *Press Publ'g Co.*, 102 F.R.D. 183, 192 (N.D. Ohio 1984) (finding counsel inadequate because

19  they were prosecuting another action against the same defendants in state court, and noting that

20  "[i]t [was] not inconceivable that the amount sought by [the two sets of plaintiffs] will exceed the

21  total assets of [defendants]," thus creating a conflict between the plaintiff groups); *Sullivan v.*

22  *Chase Inv. Services of Boston, Inc.*, 79 F.R.D. 246, 258 (N.D. Cal. 1978) (refusing to certify

23  a class because class counsel represented parties in a parallel securities fraud case against the same

24  defendant in another jurisdiction, and the possibility that defendant's assets might not be sufficient

25  to respond in both actions was "great enough to influence litigation strategy"). Compare *Dietrich*

26  *v. Bauer*, 192 F.R.D. 119, 126 (S.D.N.Y. 2000) (the fact that class counsel was prosecuting a

27

28  ───────────────────
    [111]*Id.* at 23:20.

                        43

1   parallel class action on behalf of a second set of plaintiffs did not preclude a finding of adequacy
2   of counsel because the parallel action involved a "completely different set of defendants"; the
3   situation was therefore different from those where "counsel simultaneously represents classes in
4   parallel litigations seeking to tap the same pool of finite assets"); *Sheftelman v. Jones*, 667
5   F.Supp. 859, 865 (N.D. Ga. 1987) (finding that counsel's representation of plaintiffs in two
6   parallel actions did not render them inadequate class counsel, in part because the conflicts were
7   "speculative" and "illusory," as counsel had already reached a tentative settlement in the second
8   matter and there was no evidence that defendant could not comply with the settlement terms);
9   *Anderson v. Bank of the South, N.A.*, 118 F.R.D. 136, 149 (M.D. Fla. 1987) (finding that alleged
10  conflicts were speculative and concluding that other procedural safeguards were sufficient to
11  ensure adequate class representation).

12          As these cases demonstrate, there is no hard and fast rule that prevents class counsel from
13  representing two sets of plaintiffs in parallel actions.  Where counsel represent two sets of
14  plaintiffs "potentially competing for funds from defendants with limited resources," however,
15  concerns are heightened. *In re Joint Eastern and Southern Dist. Asbestos Litigation*, 133 F.R.D.
16  425, 432 (S.D.N.Y. 1990).  Two cases provide particularly useful points of comparison: *Sullivan*
17  79 F.R.D. 246, and *Sheftelman*, 667 F.Supp. 859.

18          In *Sullivan*, the court noted that class counsel were prosecuting a parallel securities fraud
19  action in another district.  Observing that recovery by one set of plaintiffs would obviously affect
20  the other plaintiffs' ability to recover, and that defendant's assets and insurance were probably
21  insufficient to satisfy any judgment, the court found the situation rife with potential conflicts of
22  interest and conditioned class certification on counsel's withdrawal from the parallel litigation.
23  *Sullivan*, 79 F.R.D. at 258.

24          The *Sheftelman* court, by contrast, concluded that class counsel were adequate even though
25  the lawyers represented plaintiffs in a parallel action against the same defendants.  The court
26  acknowledged that the potential conflict "present[ed] some concern," but ultimately concluded
27  that it was "speculative" and "illusory," in part because counsel had already reached a tentative
28  settlement in the second matter and there was no evidence that defendants could not comply with

1  the settlement terms. *Sheftelman*, 667 F.Supp. at 865. The court reasoned that no conflict would

2  arise unless defendants were unable to satisfy judgments in both cases. *Id*. It also noted that

3  procedural safeguards existed to protect the putative class members. Not only did the Federal

4  Rules of Civil Procedure require that the court approve any proposed settlement, but the court

5  could require that counsel give class members notice of the potential conflict. *Id*. Finally, the

6  court observed that plaintiffs were represented by untainted co-counsel. *Id*.

7       *All* seeks certification of an opt-out class of "all persons in California who had residential

8  mortgage loans that were serviced by Litton between October 28, 2000, and April 11, 2007, who

9  were charged unauthorized insurance costs, late charges, escrow/impound charges and

10 foreclosure-related fees."[112] The class brings a single claim for violation of California Business

11 & Professions Code § 17200, and seeks injunctive relief, restitution, and disgorgement of

12 profits.[113] It is apparent, therefore, that there is substantial, if not complete, overlap between the

13 putative class in *All* and the proposed California Class in this case. To the extent class members

14 were assessed late charges in violation of RESPA, there is a potential overlap with the Nationwide

15 Class as well.

16      Unlike *Sullivan*, however, there is no indication that Litton would be rendered insolvent

17 if forced to pay judgments in this case and in *All*. Nor is there any evidence that the two sets of

18 plaintiffs will be required to compete for a limited pool of assets. Moody's Investor Service, in

19 its January 2006 report, characterized Litton and its parent corporation, C-BASS, as "profitable

20 companies." It also noted that C-BASS's parent companies, MGIC Investment Corporation and

21 Radian Group, Inc., have total consolidated equity of $7.8 billion, and are positioned to

22 "provide[ ] potential support for Litton's financial stability."[114]

23      Nothing in the complaint in this action or in the *All* complaint suggests that plaintiffs may

24  _____

25 [112]Declaration of R. Bruce Allensworth in Opposition to Plaintiffs' Motion for Class
    Certification ("Allensworth Decl."), Exh. 2 (*All* Plaintiffs' Motion for Class Certification at
26 14:22-27).

27 [113]Allensworth Decl., Exh. 1 (*All* Complaint).

28 [114]Wong Decl., Exh. 3 (Moody's Investor Report, Jan. 20, 2006, at 7).

45

1  obtain judgments so large as to overwhelm such a profitable and financially stable company.
2  First, RESPA caps the amount of statutory damages recoverable in any class action at $500,000
3  or one percent of the loan servicer's net worth, whichever is lower. 12 U.S.C. § 2605(f)(2)(B).
4  Second, neither plaintiffs here nor plaintiffs in *All* seek punitive or exemplary damages that could
5  magnify the impact of any judgment.

6      Moreover, the fact that there is substantial overlap between the putative *All* class and any
7  California Class that might be certified in this action indicates that counsel do not represent
8  competing sets of plaintiffs attempting to recover from the same pool of assets. To the extent
9  there is any overlap in recovery, this court and/or the *All* court will have to take steps to prevent
10 impermissible double recovery. For all of these reasons, the court concludes that this is not a
11 situation in which "counsel [will be] simultaneously represent[ing] classes in parallel litigations
12 seeking to tap the same pool of finite assets." *Dietrich*, 192 F.R.D. at 126. Consequently, class
13 counsel do not have an irreconcilable conflict of interest that renders them inadequate. Because
14 neither the named plaintiffs nor their attorneys have disabling conflicts of interest, the court finds
15 that plaintiffs have satisfied the adequacy of representation requirement.

16     **D.    Whether Plaintiffs Have Satisfied the Requirements of Rule 23(b)(2)**

17     Two elements must be satisfied before an action may proceed under Rule 23(b)(2): "(1) the
18 opposing party's conduct or refusal to act must be 'generally applicable' to the class and (2) final
19 injunctive or corresponding declaratory relief must be requested for the class.'" 7AA Charles
20 Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE CIVIL
21 No. § 1775, at 41 (2008). A Rule 23(b)(2) class is appropriate "only where the primary relief
22 sought is declaratory or injunctive." *Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir. 2003)
23 ...

[23] This does not mean that a class to be certified under Rule 23(b)(2) may not include
claims for monetary damages; it requires only that damages "not [be] the predominant relief
sought; rather, they must] instead [be] secondary to the primary claim for injunctive or
declaratory relief." *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 171 (N.D. Cal. 2004)
...

a Rule 23(b)(2) class do not have the right to opt out. *Molski*, 318 F.3d at 947. Nonetheless, a district court may exercise its discretionary authority under Rule 23(d)(2) to require notice and the right to opt out. *Id.*

**1. Whether Equitable Relief Is Available To Nationwide Class Members**

Litton contends that plaintiffs' attempt to certify a class under Rule 23(b)(2) fails because injunctive and declaratory relief are not available forms of relief under RESPA. "Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979). This presumption is overcome when the language and legislative history of a statute establish that Congress did not intend to allow injunctive relief for a violation, however. See, e.g., *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1088 (9th Cir. 1986) (concluding, based on an analysis of the statutory scheme and legislative history, that "Congress did not intend to give private RICO plaintiffs any right to injunctive relief").

Under 12 U.S.C. § 2605(f), a private litigant may recover actual and statutory damages for violations of § 2605(d), whether the action is brought solely on behalf of the plaintiff or on behalf of a class. The statute does not authorize injunctive relief. As Litton notes, the only section of RESPA that authorizes injunctive relief is 12 U.S.C. § 2607(d)(2). Section 2607 prohibits kickbacks; subsection (d)(2) of that section states: "The Secretary, the Attorney General of any State, or the insurance commissioner of any State may bring an action to enjoin violations of this section."

At least one court considering allegations that a mortgage insurer paid kickbacks to lenders [illegible] the statutory scheme set forth in § 2607 as limiting injunctive relief to enforcement [illegible], brought by state and federal officials. See *Mullinax*, 199 F. Supp. 2d at [illegible] ("In light of the [illegible] remedial scheme that Congress expressly established[] and the lack of evidence that Congress intended a different result, the Court finds that an injunction is unavailable in RESPA private actions"). The *Mullinax* court noted that RESPA "lends multiple methods

through which Congress expected to deter lenders and settlement services providers from engaging in kickbacks," and concluded that it would be inappropriate to read other remedies for such a violation into the statute. *Id.* at 334 ("When such specific remedies are enumerated, this Court is 'compelled to conclude that Congress provided precisely the remedies it considered appropriate,'" quoting *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 452 U.S. 1, 15 (1981)). See also 12 U.S.C. § 2607(d)(1),(2),(4),(5) (providing, *inter alia*, for the recovery of treble damages, costs, and attorneys' fees by private litigants, as well as for criminal penalties and imprisonment). Such a conclusion would appear to be even more appropriate with respect to claimed violations of § 2605, as that section contains no reference whatsoever to injunctive relief.

In *Wollersheim*, 796 F.2d 1076, the Ninth Circuit reached a similar conclusion with respect to RICO. Like RESPA, that statute provides specific remedies for specific violations. The civil RICO provision permits a private plaintiff to recover damages, costs, and attorneys' fees. It does not authorize equitable relief. *Id.* at 1082. A separate provision of the statute authorizes the Attorney General to institute enforcement proceedings and obtain injunctive relief. *Id.* The Ninth Circuit acknowledged that RICO was to "be liberally construed to effectuate its remedial purposes," and that the statute did not expressly limit private plaintiffs "only" to the enumerated remedies. *Id.* at 1082-83. It noted, however, that "the inclusion of a single statutory reference to private plaintiffs, and the identification of a damages and fees remedy for such plaintiffs . . . frequently implies the negative implication that *no other remedy* was intended to be conferred on private plaintiffs." *Id.* at 1083 (emphasis in original). The court also found persuasive evidence that Congress never considered the inclusion of a private right to equitable relief in the statute, and thus rejected it. *Id.* at 1088.

Citing the United States Supreme Court's decision in *Middlesex County*, the Ninth Circuit in that decision that "[w]here a statute provides in elaborate enforcement scheme that confers authority to sue on both government officials and private citizens . . . it cannot be assumed that Congress intended to enhance by implication additional judicial remedies for private citizens." *Id.* at 1082 (quoting *Middlesex County*, 453 U.S. at 14-15 ("The question whether a statutory

1  congressional intent, the *Wollersheim* court found itself compelled to "conclude that Congress

2  provided precisely the remedies it considered appropriate." *Wollersheim*, 796 F.2d at 1088

3  (quoting *Middlesex County*, 452 U.S. at 15). It noted that in the civil RICO context, there were

4  not only no indicia to the contrary, but "strong indicia of congressional intent *against* any implied

5  injunctive relief." *Wollersheim*, 796 F.2d at 1088. For that reason, the court held that private

6  litigants may not seek injunctive relief under the civil RICO statute. *Id.*

7      While the situation before the court is less compelling than that in *Wollersheim*, as

8  RESPA's legislative history does not contain "strong indicia" of a congressional intent to preclude

9  private litigants from seeking injunctive relief, the clear language of the overall statutory scheme

10  nonetheless compels the conclusion that equitable relief is not available to plaintiffs. As the

11  *Mullinax* court observed, RESPA's legislative history does not address the issue at all. *Mullinax*,

12  199 F. Supp. 2d at 334. Absent guidance that can be gleaned from the legislative history, the court

13  must conclude, "[i]n light of the multi-faceted remedial scheme that Congress expressly

14  establish[ed] and the lack of evidence that Congress intended a different result," that RESPA does

15  not permit private litigants to obtain equitable relief for violations of § 2605. As § 2607(d) makes

16  clear, Congress had clearly in mind the distinction between damages and injunctive remedies, and

17  provided that the latter were available only in actions brought by the government to enforce

18  RESPA's anti-kickback provisions. The clarity (and limited scope) of § 2607(d)(2)'s

19  authorization of injunctive relief thus supports the conclusion that Congress did not intend to

20  permit such suits by private litigants alleging violations of § 2605.

21      Where "final injunctive or declaratory relief is not available to the class as a whole for the

22  harms being asserted, then Rule 23(b)(2) cannot be utilized." 7AA Charles Alan Wright, Arthur

23  R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, Civil 3d § 1775, at 45

24  (2005). Accordingly, the court concludes that the Nationwide Class cannot be certified under Rule

25  23(b)(2).

        6.    Whether Plaintiffs Have Satisfied The Requirements Of Rule 23(b)(3)

        While plaintiffs cannot maintain a Rule 23(b)(2) class for violations of RESPA, 12 U.S.C.

10

1 § 2605, the Nationwide Class can be certified if it meets the requirements of Rule 23(b)(3).[116]

2 Rule 23(b)(3) requires that the court ask two questions: (1) do issues common to the class

3 "predominate" over issues unique to individual class members, and (2) is the proposed class

4 action "superior" to other methods available for adjudicating the controversy. See

5 FED.R.CIV.PROC. 23(b)(3).

6          a.    **Predominance**

7    The predominance inquiry of Rule 23(b)(3) is more searching than the commonality

8 requirement of Rule 23(a). See  *Amchem Products*, 521 U.S. at 609 ("Rule 23(a)(2)'s

9

10 [116]Plaintiffs did not seek certification under Rule 23(b)(3) in their moving papers, but
included a footnote "reserv[ing] the right to amend their request at a later date to seek certification

11 under Rule 23(b)(3)." (Mot. at 16 n. 10).   Although the footnote put Litton on notice of the
possibility that plaintiffs would proceed under Rule 23(b)(3), Litton elected not to address the

12 issue in its opposition.   Rather, it opted to drop a footnote of its own urging the court to

13 "disregard this purported 'reservation of rights.'" (Opp. at 26 n. 19). Shortly before the hearing
on plaintiffs' motion, Litton filed a separate objection to plaintiffs' request for certification under

14 Rule 23(b)(3), in which it contended that the request was untimely, prejudicial to Litton, and

15 inconsistent with plaintiffs' request for relief under Rule 23(b)(2).   In the alternative, Litton
requested an opportunity to brief the propriety of certification under Rule 23(b)(3).

16     Plaintiffs' decision to withhold their argument regarding certification under Rule 23(b)(3)

17 until reply comes dangerously close to running afoul of the prohibition against the submission of
"new facts or different legal arguments in the reply brief." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S.

18 871, 894-95 (1990); *U.S. ex rel England v. Los Angeles County*, No. Civ. S-04-282LKKJTM,
2005 WL 2089216 at *6 n. 26 (E.D. Cal. Aug. 30, 2005) ("No new arguments or additional

19 exhibits filed concurrently with defendant's reply brief will be considered by the court").  It is

20 clear, however, that Litton knew plaintiffs might rely on Rule 23(b)(3), and that it chose not to
argue the issue for strategic reasons.  Any prejudice Litton suffered, therefore, was more the

21 result of its own tactical choices than of sandbagging by its opponent.  Nevertheless, to ensure that

22 the issue was fully briefed, the court permitted Litton to file a 10-page post-hearing brief
addressing the propriety of certifying a class under Rule 23(b)(3)   Litton filed this brief and

23 supporting affidavits on May 7, 2007.

24     Litton's objection that plaintiffs' request for certification under Rule 23(b)(3) is
inconsistent with their request for certification under Rule 23(b)(3) is unavailing. It is well settled

25 that parties may proceed on alternative (and inconsistent) legal theories. See FED.R.CIV.PROC.

26 8(e)(2) ("A party may set forth two or more statements of a claim or defense alternately or
hypothetically"); *Cellars v. Pacific Coast Packaging, Inc.*, 189 F.R.D. 575, 578 (N.D. Cal.

27 1999) ("A party may plead alternative theories of liability, even if those theories are inconsistent
or independently sufficient").  Consequently, the court declines to strike plaintiffs' request for

28 certification under Rule 23(b)(3).

50

1  'commonality' requirement is subsumed under, or superseded by, the more stringent Rule

2  23(b)(3) requirement that questions common to the class 'predominate over' other questions");

3  *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 144 (3d Cir. 2001) ("The Rule 23(b)(3)

4  predominance inquiry tests whether the class is sufficiently cohesive to warrant adjudication by

5  representation, and mandates that it is far more demanding than the Rule 23(a)(2) commonality

6  requirement").  As a result, the fact that the court has found the commonality requirement

7  satisfied does not mean that Rule 23(b)(3)'s predominance test is satisfied as well.

8      To prove their RESPA claims, plaintiffs must show that they were assessed late fees within

9  the first 60 days after loan transfer, and that the fees were assessed for payments that were timely

10  made to a prior servicer.  To obtain statutory damages under § 2605(f), plaintiffs must also prove

11  that Litton had a pattern or practice of violating § 2605.  Once class members have been

12  identified, the only issue of any significance left to litigate will be the existence of a widespread

13  p a t t e r n   o f   v i o l a t i o n s .[117]      P r o o f   o f   s u c h

14  _____

15  [117]Litton contends Rule 23(b)(3) certification is improper because predominance can be achieved only by defining the class in such a manner that "identification of each class member will require a determination of the ultimate merits of each class member's RESPA claim, leaving nothing for a class trial."  (Memorandum of Litton Loan Servicing LP in Opposition to Certification of a Nationwide RESPA Rule 23(b)(3) Class ("Supp. Opp.") at 7:5-6).  In a similar vein, it contends that plaintiffs cannot satisfy the predominance requirement because "[t]he Court must examine, in each instance, whether the late fee charged by Litton was appropriate or not." (*Id.* at 3:7-8).  It is true that "[c]lass definitions which require the court to [assess] the merits of every individual's claim to determine if they are within the class generally do not satisfy" ascertainability requirements. *Rodriguez v. Gates*, No. CV99-13190 GAF, 2002 WL 1162675, *9 (C.D. Cal. May 30, 2002).  This general principle, however, addresses class definitions that incorporate subjective "terms that depend on resolving the claims on the merits," *Colindres v. QuitFlex Mfg.*, 235 F.R.D. 347, 368 (S.D. Tex. 2006) — e.g., classes of individuals who have been "wrongfully" treated or suffered "discrimination."  The rule carries less force in situations like the present one, where class membership can be ascertained by evaluating defendant's conduct against objective criteria.  See, e.g., *Hilao v. Estate of Marcos*, 103 F.3d 767, 774 (9th Cir. 1996) (affirming certification of a class defined as "all current civilian citizens of the Republic of the Philippines . . . who . . . were tortured, summarily executed or disappeared while in the custody of military or paramilitary groups"); *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 n. 6 (7th Cir. 1977) (noting that class membership based on defendants' conduct, unlike class membership based on prospective class members' state of mind, is not indefinite, and affirming the certification of a class of "individuals and organizations operating in Chicago that

have been subjected to the alleged pattern of unconstitutional harassment by the defendants"); see also *Oshana*, 225 F.R.D. at 580 (class membership must be "contingent on . . . objectively ascertainable factors").

Litton also complains that the court's revised class definition "place[s] the burden of establishing each putative class member's RESPA claim entirely on Litton." (*Id.* at 4:19-20). As noted, the court cannot accept this argument. Placing the burden of identifying class members on Litton is proper, since it is the entity in possession of the pertinent records. The fact that the identification process may necessitate a potentially burdensome loan-by-loan review of Litton's records does not make the class uncertifiable. See, e.g., *DeHoyos*, 240 F.R.D. at 299; *Foreman*, 2007 WL 704478 at *5; *Dunnigan*, 214 F.R.D. at 135; *Elliott*, 150 F.R.D. at 575.

Certifying plaintiffs' RESPA class is consistent with Congress' clear intention that class treatment be available for § 2605 claims. See 12 U.S.C. § 2605(f). Under Litton's view, no § 2605 class could ever be certified, as the class definition would either require an assessment of the merits of each class member's claim or include members who have no claim. This clearly was not what Congress contemplated.

The court is not persuaded that the class as defined is an impermissible "fail-safe" class. The prohibition against such classes figures prominently in Seventh Circuit jurisprudence, but has never been addressed by the Ninth Circuit. A "fail-safe" class is one in which class members are "bound only by a judgment favorable to plaintiffs but not by an adverse judgment." *Adadhunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980) (quoting *Dafforn v. Rousseau Associates, Inc.*, 1976-2 Trade Cas. (CCH), ¶ 61219, 1976 WL 1358 (N.D. Ind. July 27, 1976)). In *Dafforn*, the case that coined the term "fail safe" class, the court refused to certify a class defined as homeowners who had been charged "an artificially fixed and illegal brokerage fee." *Id.* at *1. "Since the proposed class would consist only of those homeowners who paid illegal fees," the court reasoned, "a jury determination that defendants have charged no such illegal fees would at the same time determine that there was no class. Absent class members would thereupon be free to relitigate the legality of defendants' fee structures." *Id.*

One court has explained the test for a "fail-safe" class in this manner:

"[T]o determine whether a proposed class definition includes a merit[s] determination, a court must determine whether it rests on a paramount liability question. . . . A proposed class definition that rests on the paramount liability question cannot be objective, nor can the class members be presently ascertained; when the class definition is framed as a legal conclusion, the trial court has no way of ascertaining whether a given person is a member of the class until a determination of ultimate liability as to that person is made. A fail-safe class that is based on resolving the ultimate liability issue is bound only by a judgment favorable to plaintiffs but not by a judgment favorable to defendants. Certifying a fail-safe class inevitably creates one-sided results. If the defendant is found liable, class membership is then ascertainable and the litigation comes to an end. A determination that the defendant is not liable, however, obviates the class, thereby precluding the proposed class members from being bound by the judgment. . . . Thus, to determine whether a class definition improperly includes a merit

52

determination, a court must ask itself, will the class still exist even if the defendant of the class action lawsuit wins at trial? . . . If a reviewing court determines that a victory by the defendants at trial means that no class ever really existed, then the class definition improperly includes a merits determination." *Dale v. DaimlerChrysler Corp*, 204 S.W.3d 151, 180 (Mo. App. 2006).

As this explanation makes clear, the prohibition against "fail-safe" classes assumes that liability never turns on objective criteria. In many cases, this assumption is legitimate. In *Dale*, for example, the trial court certified a class of "all individuals who purchased a new Dodge Durango in the State of Missouri . . . within [the class period] . . . who have returned to an authorized DaimlerChrysler dealer for service to failed electric regulators . . . who have not received Bosch motor window regulators and . . . who still own their Dodge Durango." *Id*. at 160. Plaintiffs' theory of liability was that defendant had failed to install Bosch motor power regulators in Dodge Durangos with power window failures, even though Bosch motor power regulators were the only remedy for such failures. *Id*. at 180. The appellate court explained that the class was not "fail safe" because it did not determine the key liability question, i.e., whether failure to install Bosch motor power regulators constituted a breach of warranty, or an unfair or deceptive trade practice.

Section 2605(d), by contrast, is a strict liability statute; xas a result, a defendant's liability under the statute turns exclusively on *objective* criteria. The concerns that underlie the prohibition against "fail safe" classes simply do not exist in such a case. This difference is illustrated by two contrasting examples:

Example 1: California law holds a dog owner strictly liable whenever his or her dog bites a person. Defendant Luigi owns 25 dogs that bite 150 individuals. Luigi has a record of every individual ever bitten by his dogs. A court can certify a class of "all individuals bitten by a dog owned by Luigi" because the very fact that they have been bitten is sufficient to impose liability on Luigi.

Example 2: California law were holds a dog owner liable whenever his or her dog bites and seriously injures a person. Defendant Mario owns 25 dogs that bite 150 individuals. Like Luigi, Mario keeps a record of every individual ever bitten by his dogs. A court cannot certify a class of "all individuals bitten and seriously injured by a dog owned by Mario," however, because the phrase "seriously injured" imports a subjective liability question into the class definition, and renders the class a "fail-safe" class.

Like the hypothetical statute in Example 1, § 2605(d) imposes strict liability on loan servicers under objective criteria. The liability issue – whether Litton violated § 2605(d) by imposing late fees within 60 days of loan transfer even though the borrower had made a timely payment to a prior servicers – is conclusively determined by the statute. Thus, while it may be true that a loan-by-loan review results in a class whose members "either win or are not in the class" (Supp. Opp. at 7:9-10), this is not the result of an improper class definition. Rather, it is

1    a pattern is common to all class members, and will not involve individual issues.[118] For this

2    reason, the court finds that the Nationwide Class satisfies the predominance requirement of Rule

3    23(b)(3).

4                        b.    **Superiority**

5            Rule 23(b)(3) lists four factors pertinent in determining whether a class action would be

6    superior to other methods for adjudicating a controversy: "(A) the interest of members of the class

7    in individually controlling the prosecution or defense of separate actions; (B) the extent and nature

8    of any litigation concerning the controversy already commenced by or against members of the

9    class; (C) the desirability or undesirability of concentrating the litigation of the claims in the

10   particular forum; [and] (D) the difficulties likely to be encountered in the management of a class

11   action."

12           On balance, these factors weigh in favor of certification. Each class member's damages

13   will be limited to the late fee(s) charged within 60 days of loan transfer, resulting interest and a

14   share of any statutory damages awarded. Given each class member's small potential recovery,

15   it is unlikely that he or she would have a compelling interest in individually prosecuting a separate

16   action. See *Amchem Products*, 521 U.S. at 617 ("The policy at the very core of the class action

17   mechanism is to overcome the problem that small recoveries do not provide the incentive for any

18   individual to bring a solo action prosecuting his or her rights"); *Chamberlan v. Ford Motor Co.*,

19   223 F.R.D. 524, 527 (N.D. Cal. 2004) ("Here, few potential class members could afford to

20

---

21   a consequence of Congress' decision in § 2605(d) to make servicers who charge late fees under
22   these circumstances strictly liable to the borrower.

23   [118] The court disagrees with Litton's assertion that "[n]o factual proof for trial would be
     necessary" to determine whether Litton has "a widespread pattern of violations," as "presumably,
24   the only question left would be whether the percentage of Litton's customers who are class
     members constitutes a 'pattern or practice' within the meaning of RESPA." (Supp. Opp. at 3:19-
25   23). While the percentage of customers subjected to improper late fees would certainly be
26   relevant to a factfinder's determination of liability, it would not alone be determinative. Rather,
     the jury will likely look to evidence of Litton's loan boarding procedures, its training of
27   employees, and its quality assurance processes as well to make such a determination. All of these
28   matters will be the subject of common proof.

                                        54

1   undertake individual litigation against Ford to recover the relatively modest damages at issue.

2   Therefore, in the absence of a class action, few class members would have any meaningful redress

3   against Ford as a practical matter.   A class action is the superior method of resolving this

4   controversy"). It is clear, in fact, that Congress understood that individual borrowers would have

5   little incentive to pursue separate actions for violations, as it expressly provided remedies for class

6   action suits. See, e.g., *Hunt v. Check Recovery Systems, Inc.*, _ F.R.D. _, 2007 WL 853031,

7   *9 (N.D. Cal. Mar. 21, 2007) (noting, in concluding that class treatment was superior to

8   individual litigation, that "the FDCPA specifically provides for and contemplates class action

9   relief").

10          There is no evidence that individual suits are pending against Litton for violation of

11   § 2605, nor is there any suggestion that it is not desirable to litigate the action in this forum.

12   Because the claim is based on a federal statute, choice of law concerns do not indicate that another

13   forum would be preferable. As plaintiffs allege a pattern or practice of violations, moreover, and

14   seek certification of a California Class as well, litigation in this forum would advance efficiency

15   and consistency. See *Negrete v. Allianz Life Ins. Co. of North America*, 238 F.R.D. 482, 495

16   (C.D. Cal. 2006) ("because plaintiffs have alleged an overarching fraudulent scheme and include

17   a California sub-class, it is desirable to consolidate the claims in this forum").

18          Finally, even if there are concerns regarding manageability, these concerns do not appear

19   sufficient to defeat certification. As one court has noted, "[m]anageability problems must be

20   factual, unavoidable obstacles to the litigation before they can be considered obstacles to class

21   certification." *Hunt*, 2007 WL 853031 at *9. None of the difficulties cited by Litton appears to

22   rise to this level. The company's computer system should reveal the names of individuals who

23   were assessed late fees within 60 days after loan transfer.[119] After this threshold group has been

24   segregated, it appears that the identification of class members will be manageable if somewhat

25

26   _____

27   [119]See Declaration of Joseph Laigaie in Opposition to Certification of a Nationwide RESPA
    Rule 23(b)(3) Class ("Laigaie Decl. II"), ¶ 20 (between 2002 and 2006, approximately 128,906

28   borrowers were assessed late fees (that were not waived) within the first 60 days of loan transfer).

1 burdensome.[120] In this regard, the court believes that it is appropriate to require plaintiffs to pay

2 the reasonable costs associated with the process of identifying class members. See *Oppenheimer*

3 *Fund, Inc. v. Sanders*, 437 U.S. 340, 358-59 (1978) (noting that is some cases, the district court

4 may conclude that a defendant should perform tasks associated with providing notice to class

5 members because it can do so more efficiently than plaintiffs, but that, where it is "substantial,"

6 the court should generally require plaintiff to pay the cost of completing the task).

7

## III. CONCLUSION

9     For the foregoing reasons, the court grants plaintiffs' motion to certify the Nationwide

10 Class as it has been redefined by the court in this order. Plaintiffs will bear the cost of identifying

11 members of the class.

12

13 DATED: May 18, 2007

                                            MARGARET M. MORROW

14                                        UNITED STATES DISTRICT JUDGE

15

16

17 _____

18 [120]Litton contends that identification of class members "will be significantly more difficult and infeasible" than the process contemplated by the court. (Supp. Opp. at 8:8-9). It notes that

19 the analysis will require a loan-by-loan review. A prior servicer who receives a payment after loan transfer typically endorses the check to Litton. (Laigaie Decl. II, ¶ 9). To determine

20 whether the payment was "timely," Litton will have to obtain a copy of the check from its bank (for checks posted before mid-2003) or review a check imaged in Litton's archives (for checks

21 posted after mid-2003). (*Id.*, ¶ 22). It will also need to exclude from the 128,906 borrowers

22 (1) non-residential commercial loans; (2) loans where Litton was the initial servicer (i.e., no transferor servicer); (3) loans against which late charges were assessed by the prior servicer prior

23 to the date of transfer; and (4) loans reflecting automatic adjustments where late fees were

24 "overridden" because they were assessed within 30 days after loan transfer. (*Id.*, ¶¶ 7, 28). None of these tasks is so onerous as to render the class uncertifiable. Loans falling into some of

25 these categories can undoubtedly be segregated by a simple computer search, e.g., non-residential

26 commercial loans and loans for which Litton was the initial servicer. Others will require a more labor-intensive, loan-by-loan review. That burden does not defeat class certification, however.

27 See, e.g., *DeHoyos*, 240 F.R.D. at 299; *Foreman*, 2007 WL 704478 at *5; *Dunnigan*, 214

28 F.R.D. at 135; *Elliott*, 150 F.R.D. at 575.

**EXHIBIT "B"**

# The Better Business Bureau
## Company & Charity Reports

**BBB of Metropolitan Houston**
Serving Austin, Brazoria, Colorado, Fort Bend, Galveston, Harris, Matagorda, Montgomery, Waller, &
Wharton Counties
1333 W. Loop South
Houston. TX 77027
713-868-9500
info@bbbhou.org

Serving Brooks, Cameron, Hidalgo, Jim Hogg, Kenedy. Starr. Willacy & Zapata Counties
2110 West 6th Street
Weslaco, Texas 78596
(956)968-3678
info@weslaco.bbb.org

*May Not Be Reproduced for Commercial or Sales Purposes*

## Litton Loan Servicing, LP

Yahoo Map
4828 Loop Central Drive
Houston, TX 77081-2226

The BBB reports on members and non-members. If a company is a member of the BBB, it
is stated in this report.

**Original Business Start Date:** 07/01/1988
**Principal:** Larry Litton, President
**Phone Number:** 800-247-9727
**Email Address:** dlerma@litton.c-bass.com
**Web Site Address:** www.littonloan.com
**Membership Status:** This company is not a BBB member
**Type of Business:** Mortgage Brokers
**Additional Business Names:**
Litton Loan Servicing
Litton Loan Servicing LLP

## CUSTOMER EXPERIENCE

Based on BBB files, this company has an unsatisfactory record with the BBB due to
unanswered complaint(s). This company currently has 10 pending cases. Please check
back with us in 30 days to find out the outcome of these cases.

Consumers may contact the company directly with any pending issues they may have.
They are asked to contact the Executive Resolution Department at 713-960-9676
extension 7770.

When evaluating complaint information, please consider the company's size and volume

of business. The number of complaints filed against the company may not be as important as the type of complaints and how the company handled them.

The BBB processed a total of 414 complaints about this company in the last 36 months, our standard reporting period. Of the total 414 complaints in the last 36 months, 164 of those were closed in the last 12 months.

Complaints Concerned
Advertising Issues: 1
Outcome of the complaint -
Resolved: 1;

Sales Practice Issues: 2
Outcome of all complaints -
Resolved: 2

Delivery Issues: 4
Outcome of all complaints -
Resolved: 4;

Service Issues: 75
Outcome of all complaints -
Resolved: 54;
Unresolved: 18; Administratively Closed: 3;

Customer Service Issues: 11
Outcome of all complaints -
Resolved: 8; Unresolved: 3;

Guarantees or Warranty Issues: 1
Outcome of the complaint -
Resolved: 1

Refund or Exchange Issues: 33
Outcome of all complaints -
Resolved: 24; Unresolved: 7; Administratively Closed: 2;

Contract Issues: 15
Outcome of all complaints -
Resolved: 9;
Unresolved: 5; Administratively Closed: 1

Billing or Collection Issues: 272
Outcome of all complaints -
Resolved: 184; Unresolved: 79; Administratively Closed: 8; No Response: 1

## LICENSING INFORMATION

This company is in an industry that may require licensing, bonding or registration in order to lawfully do business. The BBB encourages you to check with the appropriate agency to be certain any requirements are currently being met. These agencies may include The Texas Department of Savings & Mortgage Lending
2601 N. Lamar, Ste. 201

Austin. TX 78705
512-475-1350
www.tsld.state.tx.us

## ADDITIONAL TRADENAMES, ADDRESSES AND TELEPHONE NUMBERS

This business also uses the following names, addresses and/or telephone numbers:

Litton Loan Servicing, LP
For Loan Payments: PO Box 4528 (800) 247-9727
Houston, TX 77210-4528

Litton Loan Servicing, LP
For Insurance Documents: PO Box 4354 (800) 247-9727
Houston, TX 77210-4354

Litton Loan Servicing, LP
PP Box 4387 (800) 247-9727
Houston, TX 77210

Litton Loan Servicing, LP
PO Box 570848 (800) 247-9727
Houston, TX 77257-0848

Litton Loan Servicing, LP
4828 Loop Central Dr (800) 247-9727
Houston , TX 77081-2226

Litton Loan Servicing, LP
4828 Loop Servicing Drive (800) 247-9727
Houston, TX 77081

Litton Loan Servicing, LP
4824 Loop Center Dr. (800) 247-9727
Houston,, TX 77081

Litton Loan Servicing, LP
PO Box 4387 (800) 247-9727
Houston, TX 77210

(713) 966-8844

(800) 548-8665

(800) 999-8501

(713) 966-8802

(180) 088-8964

(713) 218-4592

(713) 868-9500

Litton Loan Servicing

Litton Loan Servicing LLP

This is not necessarily a complete list.

## COMPANY MANAGEMENT

Additional company management personnel include:
Executive Resolution Team and Fredrick Jordan.

## ADDITIONAL FILE INFORMATION

Here are some additional numbers for the company:

Delinquent accounts: 800.999.8501
Customer Service: 800.247.9727
Loss Mitigation: 800.548.8665

Proof of insurance- Evidence of insurance may be provided to Litton by faxing the policy to 866.510.1899, updating the information on www.imcovered.com , or mailing it to PO Box 4354, Houston, TX 77210-4354. Please have your agent update the mortgage clause to : Litton Loan Servicing, LP, Its Successors and/or Assigns.

Payoff Request - Please fax your request with the mortgagor's authorization to 713.960.9561. Litton's average response time is 4 business days. You may request a "rush" on your payoff quote by contacting Customer Service at 800.247.9727; However, there may be an additional fee charged for this request. Payoff requests for loans in foreclosure will take an additional time to calculate with attorney fees.

Bankruptcy - if your loan is in active bankruptcy status, you should have your attorney contact Litton's attorney. You may also contact Donna Medrano in our Bankruptcy Department for further assistance.

Consumers may contact the company directly with any pending issues they may have. They are asked to contact Benny Hibler at bhibler@litton.c-bass.com or via phone at (713) 561-8265. He is in the Executive Resolution Department.

Litton was asked to provide some custom text that may assist consumers and they provided the following:
Litton Loan Servicing LP has implemented a 3rd step in their Payoff Automation process. With this release, borrowers can request payoff quotes via the Voice Response Unit (VRU) and our website, www.littonloan.com. Quotes will be processed automatically and faxed out in batches every 2 hours, Litton is also offering email as a delivery method for payoff quotes. Litton's web requests will use this same exception logic, therefore, we estimate as many as 50% of the requested quotes in the VRU and Website will auto-generate. Additionally, with the new release, Litton's manual faxed requests will auto-generate at this same estimated rate.

The quickest way to obtain a quote is through our VRU or our Website, www.littonloan.com. Requests received through our automated phone system (VRU) receive priority processing (usually 1 to 3) days. Faxed requests may require longer

processing time. Please note that there can be occasional delays in processing any quote for a newly acquired loan, due to the need to review the transferred documents prior to quoting a payoff.

**EDUCATIONAL/GENERAL COMMENTS**

http://www.bbb.org/library/mortgagechoices.asp

ID: 68538
**REPORT DATE:** 01/08/2008
**COPYRIGHT DATE:** 2008 BBB of Metropolitan Houston

The information in this report has either been provided by the company, or has been compiled by the BBB from other sources.

**STANDARD DISCLAIMER**

As a matter of policy, the BBB does not endorse any product, service, or company. BBB reports generally cover a three-year reporting period, and are provided solely to assist you in exercising your own best judgment. Information contained in this report is believed reliable but not guaranteed as to accuracy. Reports are subject to change at any time.

BBB reports may not be reproduced for sales or promotional purposes.

**EDUCATIONAL TIPS**

Mortgage Choices
Shop, Compare and Negotiate - But Move with Caution When Refinancing Your Mortgage

Return to Search Results

**Optional BBB survey:**
Dollar amount you intend to spend with this company: $0        Submit

**Optional BBB survey:**
Have you seen the new BBB billboards?  ○ Yes  ○ No
Have you heard the BBB commercial on the radio?  ○ Yes  ○ No
Have you seen the BBB advertised in the newspaper?  ○ Yes  ○ No
    Submit

*check out a company or charity*        *find BBB members*
membership info      file complaints      contacts/about us      home

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VICTOR H. SPARROW, III,<br><br>Plaintiff,<br><br>v.<br><br>LITTON LOAN SERVICING, LLP,<br><br>Defendant. | Civil Action 06-00087  (HHK) |

## ORDER

On December 19, 2007, Plaintiff Victor H. Sparrow, III failed to appear at a status conference in this case.

Accordingly, this 19th day of December 2007, it is

**ORDERED** that Mr. Sparrow shall show cause in a written submission that shall be filed by no later than January 15, 2008 why his complaint should not be dismissed for failure to prosecute, or the case will be dismissed pursuant to Local Rule 83.23; and it is further

**ORDERED** that the parties shall appear in this court for a status conference on February 22, 2008 at 11:30 a.m.

Henry H. Kennedy, Jr.
United States District Judge

## PROOF OF SERVICE

I, Trung Van La, state and declare under penalty of perjury that I am a citizen of the United States and that I reside in the City of Silver Spring, County of Montgomery, State of Maryland. I am over the age of eighteen (18) years and not a party to the above encaptioned action. My business address is 1200 New Hampshire Avenue, N.W., Washington, District of Columbia 20036.

On the day set forth below I served the within **"NOTICE OF MOTION & MOTION FOR JUDICIAL NOTICE"** in Civil Action No.: **05 0581 HHK** in the United States District Court for the District of Columbia on each of the Defendants by placing a true copy thereof enclosed in a sealed envelope with first class Postage thereon fully prepaid, in the United States Postal Service Mail depository at Washington City within the District of Columbia, addressed to each of the following:

Kenneth MacFadyen, Esquire
Michael T. Cantrell, Esquire
Friedman & MacFadyen
210 East Redwood Street
Baltimore, Maryland 21202

I declare under penalty of perjury under the law of the District of Columbia that the foregoing is true and correct pursuant to 28 *United States Code* §1746.

Executed at Washington City, within the District of Columbia on January 10, 2008.

Dated: January 10, 2008

**TRUNG VAN LA**